THOMAS INDUSTRIES, INC.,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 81–1222.

United States Court of Appeals,
Sixth Circuit.

Argued April 16, 1982.

Decided Sept. 9, 1982.

Walter O. Lambeth, Jr., Elarbee, Clark & Paul, Bennet D. Alsher, Atlanta, Ga., for petitioner.

Elliott Moore, Deputy Associate Gen. Counsel, Jerry Wohlgemuth, N. L. R. B., Washington, D. C., for respondent.

Before CONTIE, Circuit Judge, BROWN, Senior Circuit Judge, and DUMBAULD,* Senior District Judge.

CONTIE, Circuit Judge.

This appeal involves the question of when and how an employer may poll its employees to determine the majority status of an incumbent union. The National Labor Relations Board found that Thomas Industries, Inc. (the Company) violated section 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 151 et seq., by polling its employees and violated section 8(a)(5) of the Act by refusing to bargain with the incumbent union. In an unrelated matter, the Board also found that the Company violated section 8(a)(1) by verbally warning a union officer for filing what the Company considered to be petty grievances. The Board's opinion appears at 255 NLRB No. 94 (1981).

Based on its findings, the Board issued an order requiring the Company to post a notice stating that the Company would not refuse to bargain with the union, would not coercively poll its employees, and would not verbally reprimand employees or union officials for filing grievances. The Board's order further required the Company to bargain upon request. The Company has petitioned for review and the Board seeks enforcement of its order. For the reasons stated below, we enforce the Board's order only as it relates to the verbal warning.

## FACTS

On February 10, 1977, a secret ballot election was conducted by the NLRB in the Company's plant. By a vote of 52 to 50, the Company's production and maintenance employees selected the Oil, Chemical, and Atomic Workers International Union (the Union) as their exclusive collective bargaining representative. The Union was certified by the NLRB on May 18, 1977. On July 11, 1977, the Company and the Union entered into a collective bargaining agreement effective until January 11, 1980, and thereafter from year to year unless either side provided timely written notice of its desire to amend or terminate.

The first of two incidents involved in this appeal occurred on August 28, 1979. In a grievance meeting, Union vice-president Della Dugger was allegedly given a verbal warning for filing too many petty grievances. One of the grievances involved supervisors doing maintenance work and another involved overtime pay. The Company denied giving any verbal warning to Dugger, contending that any statements made

---

* The Honorable Edward Dumbauld, Senior U. S. District Judge for the Western District of Penn-sylvania, sitting by designation.

were merely part of open, frank, and sometimes heated grievance meetings.

The second incident involved in this appeal was a poll of the employees conducted by the Company on October 19, 1979, to determine whether the Union still represented a majority of the employees. Prior to the poll, the Company president had come to doubt the continuing majority status of the Union. He based this belief on negative employee comments, employee resignations from the Union, resignations by Union officials, and a sharp decrease in the number of employees on Union dues checkoff.

Immediately before taking the poll, the Company president made a "captive audience" speech to the employees. The entire speech is reproduced below:

> We have called this meeting today of all production and maintenance employees in order to get your decision as to whether or not you want the Company to continue to deal with the Oil, Chemical and Atomic Workers Union on all matters pertaining to your job.
>
> Many of our employees during this past year have asked why the Company still gives recognition to the Union since so few of the production and maintenance employees have indicated any interest in the Union and approximately 30% of the employees are on check-off. Let me make this point very clear. The only reason that the Company has recognized the Union is because the law has required us to do so. We do not want the Oil, Chemical and Atomic Workers Union here and we think it would be in your best interest if there is no union here. On the other hand, the Company does not want to do anything that would be a violation of the law. You as an individual have the right to vote for the Union if you desire to do so, and the Company respects your rights.
>
> Up until now we have had no choice but to deal with the Union since the law requires us to do so. However, the contract is now about to terminate on January 11, 1980 and you as an individual

> have the right to decide for yourself now whether or not you want the Company to continue to recognize the Union. That is our purpose in being here today—to determine whether the Union continues to represent a majority of our employees. If the Union fails to poll a majority of the votes cast the Company will no longer recognize the Oil, Chemical and Atomic Workers Union as your bargaining representative at the expiration of this contract. Of course, should the Union receive a majority of the votes cast the Company must by law continue to recognize them as your bargaining agent.
>
> In order to make sure that everyone's rights are protected we are going to let each of you vote a secret ballot. I have asked Mr. James Epps, Attorney, Johnson City, to come here today to handle the election and to count the ballots in your presence. There will be no supervisors or representatives of management present when you vote on this important matter. We ask that you stay in this room and vote one at a time in the first aid room. As soon as you have voted and placed your ballot in the box, you may clock out and go home or stay and see the results. You will be paid for a full days work, and your paychecks will be passed out to you at the time clock. We ask that the second shift wait until last to vote and then return to your work stations. I intend to leave now and will turn this meeting over to Mr. James Epps unless any of you have any questions that you want to ask me before I leave.

Following the Company president's speech, Mr. James Epps, a local attorney hired by the Company to conduct the poll, was introduced. Epps described the voting procedures and then spoke to the employees as follows:

> Before you go vote, the Company has asked me to emphasize certain points to each of you:
>
> 1. The only purpose in our having this election is to determine whether or not you want this union as your representative.

2. The Company has asked me to tell each of you that no action will be taken against anyone as a result of how you vote. This is your election and you have the legal right to vote however you please.

3. This will be a secret ballot election. No one will ever know how you vote unless you voluntarily tell them.

The Union president also spoke briefly before the poll was taken. The polling was done in the plant cafeteria, the same location used for the 1977 certification election. Each employee was given a simple "Yes" or "No" ballot asking if he wished to be represented by the Union. One at a time employees took their ballots into a small room and marked them. The room had a door which most employees closed at least partially. The employees then deposited their ballots in a sealed box and were free to leave the cafeteria or stay to learn the results. No management members were present during the voting.

When everyone had voted, Epps and the Union observer counted the ballots. The poll results, as stipulated to by the parties, were as follows:

124 eligible voters

112 votes

64 votes against the Union

48 votes for the Union

Based on the results of this poll and the other evidence of loss of support, the Company refused to bargain with the Union, and the unfair labor practices charges were filed. The collective bargaining agreement was honored until its expiration.

## STANDARD OF REVIEW

■ We must grant enforcement of the Board's order if we find substantial evidence on the record as a whole to support the Board's findings. We are not free to substitute our judgment for that of the Board simply because we would have made a different decision had we heard the case *de novo*. *Randall, Burkart/Randall Div. of Textron, Inc. v. NLRB*, 638 F.2d 957, 959 (6th Cir. 1981). On the other hand, this court is not a "rubber stamp" or the enforcement arm of the NLRB, and we must review the evidence unfavorable to the Board's position as well as the evidence supporting it. *NLRB v. Brown Food Store*, 380 U.S. 278, 289–92, 85 S.Ct. 980, 987–988, 13 L.Ed.2d 839 (1965); *Peoples Gas System, Inc. v. NLRB*, 629 F.2d 35 (D.C.Cir.1980).

## VERBAL WARNING

■ The first issue before the court is whether there is substantial evidence to support the Board's finding that the Company violated section 8(a)(1) by verbally reprimanding Della Dugger for filing petty grievances.

The only dispute between the parties is whether or not Dugger was, in fact, given a verbal warning. This was a credibility question which was resolved by the administrative law judge against the company. Such resolutions should be affirmed unless they are inherently unreasonable or self-contradictory. *NLRB v. Randle-Eastern Ambulance Service, Inc.*, 584 F.2d 720, 730 (5th Cir. 1978). We find the administrative law judge's finding to be neither and therefore enforce that portion of the Board's order which relates to the verbal warning.

## POLLING EMPLOYEES

The most critical issue in this appeal is whether the Company was justified in polling its employees to determine if the Union still enjoyed the support of a majority of the employees. Two basic considerations are at play in deciding when an employer may poll its employees. First, the choice of a collective bargaining representative should be left to the employees; the interests of the employer and the incumbent union are purely secondary. Second, the employer must and may collectively bargain only with a representative who represents a majority of the employees; it is an unfair labor practice to refuse to bargain with a union which represents a majority of the employees or to bargain with a union which does not have majority support. *See NLRB v. West Sand and Gravel Co.*, 612 F.2d 1326, 1328 (1st Cir. 1979). The employer, there-

fore, has an interest in ascertaining the majority status of an incumbent union since it should only deal with a union which represents a majority of the employees in the appropriate bargaining unit.

■ To preserve stability in bargaining, an incumbent union enjoys an irrebuttable presumption of majority status for one year after its certification, and a rebuttable presumption thereafter. *Cain's Generator & Armature Co., Inc. v. NLRB*, 628 F.2d 933, 934 (6th Cir. 1980). In this case, the presumption was rebuttable since more than one year had passed. In order to rebut the presumption of majority status and lawfully refuse to bargain with a certified union, an employer must disprove majority support by presenting clear, cogent, and convincing evidence of *either* (a) an actual loss of majority status, or (b) objective considerations to support a good-faith doubt as to majority status. *Id.* at 934.

The Company's position is a difficult one. If it believes that the incumbent union has lost majority support, it may lawfully refuse to bargain. However, if that determination is not sufficient according to the Board, it will have committed an unfair labor practice. In the present case, to avoid the risk of committing an unfair labor practice, the Company decided to poll its employees to determine with greater certainty if the employees continued to support the Union.

■ Both parties agree that such polls are justified only if the employer has an objective basis for doubting in good faith the union's majority status. However, they disagree as to what constitutes a sufficient objective basis. The Board takes the position that an employer must set forth objective evidence establishing that over 50% of the affected employees have rejected the incumbent union as their representative before the employer may take a poll. This is the same showing required by the Board before an employer may lawfully refuse to bargain with a certified union. We find the Board's position to be untenable. Under the Board's analysis, an employer would only be allowed to take a poll under circum-

stances where no poll was necessary; the only value of the poll would be to double-check the employer's already sufficient evidence to refuse to bargain.

We hold that an employer may poll its employees to determine their union sentiment if it has substantial, objective evidence of a loss of union support, even if that evidence is insufficient in itself to justify withdrawal. *See NLRB v. A. W. Thompson, Inc.*, 651 F.2d 1141, 1144–45 (5th Cir. 1981); *Pioneer Inn Assocs. v. NLRB*, 578 F.2d 835, 840 (9th Cir. 1978); *NLRB v. North American Mfg. Co.*, 563 F.2d 894, 896 (8th Cir. 1977). The key inquiry is whether the Company had substantial, objective evidence of *loss* of support for the Union. *NLRB v. A. W. Thompson, Inc.*, 651 F.2d 1141, 1145 (5th Cir. 1981). As noted previously, the Company had decided to take a poll because of negative employee comments about the Union, employee resignations from the Union, resignations by Union officials, and a sharp decrease in the number of employees on dues check-off.

■ Following the administrative hearing, the administrative law judge found that 42 employees out of the bargaining unit of approximately 120 employees had made negative comments about the Union but that ten of those making negative comments made statements which fell short of repudiation. The administrative law judge further found that 12 of the 42 employees making negative comments had resigned from the Union. Ten other employees also had resigned. He also found that two members of the Union negotiating committee, three stewards, and one Union vice-president had resigned. Finally, the administrative law judge found that the percentage of employees on dues check-off declined from 63% in January 1979, to 31% in October 1979 (when the poll was taken).

Based on his findings, the administrative law judge held that the Company had no objective basis to doubt the majority status of the Union and accordingly found the polling to be a violation of section 8(a)(1) and the refusal to bargain to be a violation

of section 8(a)(5). The Board concurred in the administrative law judge's findings.

We find no substantial evidence to support the Board's conclusion that the Company did not have a good faith doubt as to the Union's majority status. We recognize that the test adopted today by this court differs from the Board's test in that it allows polling on a lesser showing of objective evidence of a good-faith doubt. However, we find that it is not necessary to remand this case to the Board for application of the lesser standard because the evidence as found by the administrative law judge clearly demonstrates that the evidence presented by the Company was at least sufficient to justify taking a poll.[1]

The most probative evidence of loss of support for the Union was the decline in dues check-offs. The mere fact that a low percentage of employees utilize automatic check-offs does not necessarily indicate a loss of support for the Union since the check-offs are voluntary. However, a rapid or large decline in the number of check-offs may be indicative of a loss of support. *See Ingress-Plastene, Inc. v. NLRB*, 430 F.2d 542, 546–47 n.6 (7th Cir. 1970); *NLRB v. Triplett Corp.*, 619 F.2d 586 (6th Cir. 1980). In *Triplett*, this court found that the employer had legally refused to bargain based on a good-faith doubt as to the incumbent union's majority status. The most significant objective evidence supporting that good-faith doubt was that ⅛th of the employees had resigned from the union and rescinded automatic check-offs, leaving fewer than ⅓ of the employees on automatic check-offs. *NLRB v. Triplett Corp.*, 619 F.2d 586, 587 (6th Cir. 1980). As in *Triplett*, the key factor in this case is not the percentage of employees on check-offs but rather the rapid decline in check-offs. In

the ten months before the Company took its poll, authorizations for dues check-offs dropped from 63% of the employees in the bargaining unit to 31%.

Because it is subject to varying interpretations, even a rapid or large decline in check-offs may not be enough in itself to justify the taking of a poll. *Peoples Gas System, Inc. v. NLRB*, 629 F.2d 35, 44 (D.C. Cir.1980). In this case, however, the Company had additional objective evidence of employee dissatisfaction with the Union. Besides the drop in check-offs, the Company presented credible evidence that at least ⅓ of the employees in the bargaining unit had made negative comments about the Union.[2] Also significant were the employee resignations from the Union. The resignations of six Union officials, including one vice-president, are probative of loss of Union support, especially considering the size of the bargaining unit.

■ In determining whether an employer has sufficient objective evidence of loss of union support to justify taking a poll or withdrawing from bargaining, the cumulative effect of all of the evidence must be considered. *See Bellwood General Hospital, Inc. v. NLRB*, 627 F.2d 98, 104 (7th Cir. 1980); *Dalewood Rehabilitation Hospital, Inc. v. NLRB*, 566 F.2d 77, 80 (9th Cir. 1977). Considering the cumulative effect of all of the evidence, we find that the Company presented substantial, objective evidence of loss of union support sufficient to justify taking a poll.

■ To be reliable, the polling must be non-coercive and procedurally fair. To accomplish these goals, the polling should comply with the guidelines set out for pre-certification polling in *Struksnes Construc-*

1. We do not reach the issue of whether the evidence of loss of support was sufficient, without considering the poll, to justify the Company's refusal to bargain with the Union.

2. The Board contends that this evidence is not probative of loss of support since the initial certification vote was very close (52 to 50 in favor of the Union) and those employees making negative comments may never have been Union supporters. While it may be true that

such evidence is not conclusive as to loss of majority, it does not mean that it is not objective *evidence* of an employer's good-faith doubt. An employer cannot be expected to furnish conclusive proof of loss of support—all that is required is objective evidence which supports a good-faith doubt. *Peoples Gas System, Inc. v. NLRB*, 629 F.2d 35, 44 (D.C.Cir. 1980).

*tion Co.*, 165 NLRB 1062 (1967). *NLRB v. A. W. Thompson, Inc.*, 651 F.2d 1141, 1144–45 (5th Cir. 1981). Those guidelines require that: (1) the purpose of the poll is to determine whether the union enjoys majority support; (2) the purpose is communicated to the employees; (3) assurances against reprisals are given; (4) the employees are polled by secret ballot; and (5) the employer has not engaged in unfair labor practices or otherwise created a coercive atmosphere. *Struksnes Construction Co.*, 165 NLRB 1062, 1063 (1967).

There is no dispute that the first four guidelines were followed by the Company. The administrative law judge found that the fifth guideline was violated and concluded that the poll was coercive. He found that the Company had committed several unfair labor practices which created a coercive atmosphere. One of the unfair labor practices was the "captive audience" speech given by the Company president before the poll. The Board did not decide if the poll was coercive but its other findings undermine the basis for the administrative law judge's finding. The Board found that the "captive audience" speech was not an unfair labor practice in itself and only found one unfair labor practice besides the polling, the verbal warning against Della Dugger. The Board further found that the Dugger violation was too remote in time to render the speech coercive. We likewise find that the Dugger violation was insufficient in itself to create a coercive atmosphere at the polling.

On appeal, the Board argues that the "captive audience" speech, while not an unfair labor practice in itself, did prejudice the poll. We find no merit in this argument. We find that the speech primarily communicated the purpose of the poll to the employees, as required by *Struksnes*. We would further note that the Union president also spoke to the employees before the

voting. We find that the polling was conducted in accordance with the *Struksnes* guidelines and was not coercive.

By today's holding, we do not intend to promote or encourage employer polls. To the contrary, such polls are not favored because of their potential for disrupting the bargaining process.[3] However, we believe that such polls are a useful and legitimate tool for the sincere employer who is faced with substantial, objective evidence of loss of support. Furthermore, such polls will be closely scrutinized to insure that the voting procedures were fair and that the employer did not create a coercive atmosphere.

We conclude, in this case, that the Company legally polled its employees and legally refused to bargain with a union which did not represent a majority of the employees in the bargaining unit. Here, a non-coercive poll indicated that the Company had correctly gauged its employees' sentiments. Simply put, the employees did not want to be represented by this particular union. We respect that choice and deny enforcement of the Board's order with regard to the polling and the refusal to bargain.

The Board's cross-application for enforcement of its order is GRANTED only insofar as it relates to the section 8(a)(1) violation for verbally warning Della Dugger; enforcement of the balance of the Board's order is DENIED.

---

**3.** The preferable course for an employer who has doubts as to the continuing majority status of an incumbent union is to file a decertification petition. *See Bally Case and Cooler, Inc., of Delaware v. NLRB*, 416 F.2d 902, 905 (6th Cir. 1969). However, this may not be a viable alternative in some cases since the Board will not process such petitions if unfair labor practice charges are pending. *See NLRB v. Randle-Eastern Ambulance Service, Inc.*, 584 F.2d 720, 729 n.10 (5th Cir. 1978).