872 F.2d 1027
 134 L.R.R.M. (BNA) 2431
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
GREENLEAF MOTOR EXPRESS, INC., and Ashtabula Chemical Corp.,
Respondent.
 No. 88-5094.
 United States Court of Appeals, Sixth Circuit.
 March 29, 1989.
 
 Before KEITH, BOYCE F. MARTIN, Jr., and RYAN, Circuit Judges.
 KEITH, Circuit Judge:
 
 
 1
 The National Labor Relations Board ("the Board") petitions this court to enforce its order against Greenleaf Motor Express, Inc. ("Greenleaf"), a union shop, and Ashtabula Chemical Corporation ("Ashtabula"), a non-union shop, which together constitute a single employer ("the Company") for purposes of enforcing provisions of the National Labor Relations Act ("the Act") (29 U.S.C. Secs. 151-188). The Board's order is reported at 286 N.L.R.B. 117 (1987). The order requires the Company to cease and desist from its unfair labor practices, which involve the maintenance of double-breasted operations; and to bargain with the International Brotherhood of Teamsters, Warehousemen and Helpers of America, Local 377 ("the Union"), as the representative of all employees in the appropriate bargaining unit. For the following reasons, we ENFORCE the order of the Board.
 
 I.
 A.
 
 2
 The Company is composed of two trucking concerns engaged in the interstate and intrastate transportation of bulk chemicals. The Company originally operated Greenleaf, a union shop. For over thirty years, Greenleaf and the Union have been parties to collective bargaining agreements that define the bargaining unit as including all "drivers" or "driver-helpers" operating vehicles for "transportation purposes." The bargaining agreements require that all covered employees join the Union within 31 days of initial employment.
 
 
 3
 In 1979, the Company formed a separate trucking concern, Ashtabula, a non-union shop. Ashtabula began to hire brokers--truck owner-operators--to haul loads in 1982. Ashtabula's owner-operators leased their trucks to Greenleaf and received separate payments from Greenleaf for their driving services. At all relevant times, Ashtabula and Greenleaf shared common facilities and equipment, operating out of a single location in Ashtabula, Ohio.
 
 
 4
 In October, 1983, the Company eliminated the brokerage operation and placed the owner-operators on Ashtabula's payroll. The Ashtabula driver-employees were leased exclusively to Greenleaf to drive Greenleaf trucks. The Company then formulated and administered a common labor policy affecting the union Greenleaf drivers and the non-union Ashtabula drivers. All drivers worked under the same supervisor; attended combined safety meetings; and were held to the same work rules. Moreover, all drivers served the same customers. Greenleaf drivers were sometimes paired with Ashtabula drivers on a single trip in the same truck. In addition, all drivers were paid at the same rates, but amounts deducted from the Greenleaf drivers' wages for union health, welfare and pension benefits were not deducted from the Ashtabula drivers' wages. Even though the Company operated Greenleaf and Ashtabula as a single integrated business enterprise, the Company did not enforce the collective bargaining agreement by requiring the Ashtabula drivers to join the Union within 31 days of employment.
 
 
 5
 On May 15, 1984, Union Business Agent Frank Licate accompanied Greenleaf Driver Jerry Ashley to Columbus, Ohio, to attend a grievance hearing. From Ashley's remarks on the trip, Licate learned for the first time that the non-union Ashtabula drivers were performing bargaining unit work. On June 5, 1984, Licate began negotiating a new collective bargaining agreement by submitting the Union's contract proposal to the Company. The proposal stated, in part, that:
 
 
 6
 Greenleaf Motor Express and Ashtabula Chemical must honor the recognition clause in the National Master Freight Agreement by informing all Ashtabula Chemical employees to become members of Teamsters Local Union 377 after thirty one (31) days of employment.
 
 
 7
 By an informal telephone call on June 5, 1984, and by a formal grievance filed on June 6, 1984, Licate again informed the Company that Greenleaf and Ashtabula were not in compliance with the collective bargaining agreement.
 
 
 8
 On July 7, 1984, the Company conducted a safety meeting for Ashtabula drivers and Greenleaf drivers. Company officials stated that they wanted Ashtabula drivers to remain non-union while Greenleaf drivers remained in the Union. The Company officials then outlined the advantages and disadvantages of union membership and the costs of union benefits. One official stated that the Company would establish an employer-employee committee to provide the drivers with independent representation and to make the Union obsolete.
 
 
 9
 On August 18, 1984, the Union drivers voted to reject the Company's contract proposal because it limited the bargaining unit to drivers receiving all their wages from Greenleaf. Licate's request that the Company officials engage in additional bargaining was refused.
 
 
 10
 On August 25, 1984, Company officials met separately with the Greenleaf drivers and the Ashtabula drivers. The Greenleaf drivers were polled and asked to indicate their support or rejection of the Union demand that the Ashtabula drivers be required to join the Union. The Greenleaf drivers unanimously voted that they had no preference. At the meeting with the Ashtabula drivers, the Company officials discussed the cost of benefits and union dues that would be required if the drivers joined the Union. The employees were then polled as to their Union sentiments. The Ashtabula drivers voted 10-4 against joining the Union.
 
 B.
 
 11
 On September 12, 1984, the Union filed charges of unfair labor practices with the Board. A complaint was issued on behalf of the General Counsel on October 31, 1984. After the Administrative Law Judge ("ALJ") issued an opinion on May 22, 1986, the Board issued its order on September 17, 1987.
 
 
 12
 The Board found that Greenleaf and Ashtabula constitute a single employer for purposes of the Act and that the Union drivers employed by Greenleaf and the non-union drivers employed by Ashtabula all form a single appropriate bargaining unit. Accordingly, the Board found that the Company's refusal to bargain with the Union as the representative of Ashtabula's employees violated Sections 8(a)(5) and (1) of the Act (29 U.S.C. Sec. 158(a)(5) and (1)). The Board also found that the Company violated Section 8(a)(1) of the Act (29 U.S.C. Sec. 158(a)(1)) by pollings its employees on whether they agreed with lawful Union demands and membership policy; by excluding Union officials and dealing directly with the employees; by interrogating the employees about their Union sentiments; and by promising the employees that the Company would establish an employer-employee committee to replace the Union.
 
 
 13
 The Board's order requires the Company to cease and desist its interference in the employees' exercise of their rights guaranteed by Section 7 of the Act (29 U.S.C. Sec. 157). Affirmatively, the order requires the Company to bargain with the Union as the representative of all employees in the single appropriate bargaining unit. The Board's decision also requires the Company to provide notice of the order and to pay monetary benefits to each employee that was unlawfully classified as "non-union," from March 12, 1984, until such time as the Company and the Union enter into an alternative collective bargaining agreement.
 
 
 14
 On January 21, 1988, the Board filed an Application for Enforcement before this court. On February 3, 1988, the Company filed an Answer to the Board's Application.
 
 II.
 
 15
 Conceding that its failure to bargain with the Union as the representative of Ashtabula's drivers was unlawful under Sections 8(a)(5) and (1) of the Act, the Company contends that the Union's unfair labor practice charges were untimely under Section 10(b) of the Act (29 U.S.C. Sec. 160(b)). The Company also disputes the Board's finding that the Company interfered with its employees' exercise of rights guaranteed by Section 8(a)(1) of the Act.
 
 A.
 
 16
 The Company argues that the Union's unfair labor practice charge, under Sections 8(a)(5) and (1), is barred by the statute of limitations. The Company relies on Section 10(b) of the Act which states that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board ..." 29 U.S.C. Sec. 160(b). The Company argues that it began its illegal conduct in 1982, when it first hired non-union Ashtabula drivers, and that the Union has known of this conduct since 1982. The Company concludes that since the Union did not file an unfair labor practice charge until September 12, 1984, the Company is now immune from prosecution.
 
 
 17
 Our consideration of the Company's defense is animated by two concerns. First, because Section 10(b) is an ordinary statute of limitations, it is an affirmative defense that must be proved by the party alleging it. See NLRB v. Mueller Brass Co., 509 F.2d 704, 708 (5th Cir.1975). Second, to sustain its Section 10(b) defense, the Company must prove that the factual conclusions of the Board are in error. The Company specifically challenges the Board's finding that the Union did not know of the nature or significance of the Company's unlawful conduct until May, 1984. Before examining this argument at length, we note that findings of fact made by the Board are to be accepted as correct on review if they are supported by substantial evidence on the record as a whole. 29 U.S.C. Sec. 160(e); NLRB v. A & T Manufacturing Co., 738 F.2d 148, 149 (6th Cir.1984).
 
 
 18
 In NLRB v. Allied Products Corp., 548 F.2d 644, 650 (6th Cir.1977), we endorsed the Board's holding that the Section 10(b) "six month limitation period does not begin to run until the employer's unlawful activity, which is the basis for the unfair labor practice charge, has become known to the charging party." Id. See also Armco, Inc. v. NLRB, 832 F.2d 357, 362 (6th Cir.1987) ("[W]e agree with the Board's statement in [United States Postal Service Marina Mail Processing Center, 271 N.L.R.B. 397, 400 (1984) ], that the 10(b) period begins to run at the time an employee receives unequivocal notice of an adverse employment action rather than the time that action becomes effective ...").
 
 
 19
 Reviewing the record in this case, the Board explained:
 
 
 20
 The record is clear that [Union Business Agent] Licate first learned about [the Company's] using non-union drivers alongside unit employees in May 1984, within the 6-month period of Section 10(b) of the Act, and that he immediately investigated and protested the matter. For these reasons--including the changing nature of the Ashtabula operation, the reasonable understanding of the Greenleaf drivers, and the swift and staunch reaction by [Licate] once he learned that the [Company] was using unrepresented drivers to do bargaining unit work--we find no basis for concluding that the Union condoned the [Company's] activities or in any way waived its representational rights over the Ashtabula drivers.
 
 
 21
 268 N.L.R.B. 117.
 
 
 22
 The Board's decision was based, in part, on its finding that the changing nature of the Company's operations precluded the Union from knowing that the non-union Ashtabula drivers were infringing on bargaining unit work until 1984. The Company responds that in 1982, its violation of the collective bargaining agreement was open and notorious, and that such open and notorious conduct was sufficient to activate the Section 10(b) period. See, e.g., Contractors Health & Welfare Plan v. Harkins Construction and Equipment Co., 733 F.2d 1321 (8th Cir.1984). We find the Company's argument unpersuasive. First, because the Company used Ashtabula owner-operators before hiring Ashtabula employee-drivers in 1983, it is reasonable to assume that the Union did not immediately know that the Company was circumventing the collective bargaining agreement through the creation of a non-union workforce. See NLRB v. Anthony Co., 557 F.2d 692, 696 (9th Cir.1977) (concluding that the Board is free to make reasonable inferences on direct and circumstantial evidence). Second, the Union could have reasonably assumed that even in 1983, the Ashtabula employee-drivers, who worked in a different state, were owner-operators without a sufficient shared "community of interests" to comprise a single appropriate bargaining unit with the Greenleaf drivers. See, e.g. South Prairie Construction Co. v. Local No. 627, 425 U.S. 800, 805 (1976). Third, the Company's argument that its conduct was open and notorious is rebutted by the grievance proceedings of Ashley, who informed the Union of the non-union Ashtabula employee-drivers in May, 1984. The Company fought the Ashley grievance through arbitration and steadfastly argued that the Ashtabula drivers were not working in violation of the collective bargaining agreement. Thus, the Company did not openly engage in unlawful conduct, but effectively concealed its violations of the labor agreement. Cf. NLRB v. Don Borgess Const. Corp., 596 F.2d 378, 382 (9th Cir.1979) (stating that intentional fraudulent concealment tolls a statute of limitations).
 
 
 23
 The Board's decision also rests on the testimony of the Union officials, which the Board credited over the testimony of the Company officials. We note that such credibility resolutions will be sustained unless they are found to be inherently unreasonable. Colfor, Inc. v. NLRB, 678 F.2d 655, 656 (6th Cir.1982).
 
 
 24
 The Board reasonably credited the testimony of Union Steward Wright, a Greenleaf driver, who stated that he did not know when the non-union Ashtabula drivers were transferred from Greenleaf's payroll, as owner-operators, to Ashtabula's payroll as employee-drivers. Thus, because the union Greenleaf drivers were unclear on the changing status of the Ashtabula drivers, the Union officials did not learn, until 1984, that the bargaining unit was affected by the Ashtabula operational changes.
 
 
 25
 The Board also reasonably credited the testimony of Union Business Agent Licate, who stated that he did not learn of the Company's infringement on the bargaining unit work of Greenleaf drivers until his conversations with Ashley in May, 1984. The Board correctly concluded that Licate's swift protest action after his conversation with Ashley strongly suggested that if he had had the same information earlier, he would have acted on it. Licate, however, only gained knowledge of the Company's unlawful conduct in May, 1984. He then filed timely unfair labor practice charges against the Company in September, 1984, well in advance of the six-month limitation imposed by Section 10(b).
 
 
 26
 Therefore, we are persuaded that substantial evidence exists to support the Board's finding that the Union did not know of the Company's unfair labor practices until May, 1984. The Board's holding that the Union did not acquiesce to the Company's unlawful conduct nor waive its right to represent the Ashtabula drivers must be accepted.[1]
 
 B.
 
 27
 The Company also challenges the Board's findings that, in addition to its violations of the collective bargaining agreement, the Company also committed several independent violations of Section 8(a)(1) of the Act (29 U.S.C. Sec. 158(a)(1)). The ALJ observed that there was a strong relationship between the Company's coercive conduct directed at individual employees--violations of Section 8(a)(1)--and the Company's unlawful conduct directed at the Union. The Board found that the Company's violations included: (1) bypassing the Union and dealing directly with the bargaining unit employees; (2) promising to form an employer-employee committee to resolve employee complaints independent of the Union; (3) interrogating employees about their Union sentiments; and (4) polling employees concerning their support of Union demands and desire for Union membership. The Company responds that all of the Board's findings as to its Section 8(a)(1) violations are in error, for the Company never engaged in conduct that suggested an "element of coercion or interference" in the employees' exercise of rights guaranteed by the Act. See Midwest Stock Exchange v. NLRB, 635 F.2d 1255, 1267 (7th Cir.1980). Our review of the record, however, persuades us that the Company's argument lacks merit.
 
 
 28
 On July 7, 1984, Company officials told the non-union Ashtabula drivers and the union Greenleaf drivers that they did not need the Union, and then promised to establish an employer-employee committee to protect the drivers' interests. In NLRB v. Delight Bakery, Inc., 353 F.2d 344, 345 (6th Cir.1965), we held that even though no "heavy-handed, coercive devices" were used, an employer's efforts to form an employer-employee committee to resolve grievances "while disputing the bargaining unit and refusing to bargain with the [u]nion" violates Section 8(a)(1) of the Act. Id. Considering the record in this case, we conclude that the Board reasonably found that the Company's promises of an employer-employee committee and direct dealing with bargaining unit employees constituted violations of the Act. See id.
 
 
 29
 The Board's additional finding, that the Company's polling and interrogation of its drivers was coercive and unlawful, is also supported by substantial evidence. On August 25, 1984, Company officials polled the non-union Ashtabula drivers as to their desire to join the Union, but only after explaining the costs of Union membership. The Company officials also polled the union Greenleaf drivers as to their support of the Union demand that Ashtabula drivers be included in the bargaining unit. The ALJ drew a reasonable inference that the Company was motivated by a desire to resolve its conflicts with the Union through direct dealing with individual employees.
 
 
 30
 In Thomas Industries, Inc. v. NLRB, 687 F.2d 863, 869 (6th Cir.1982), we adopted the employer polling guidelines set forth by the Board in Struksnes Construction Co., 165 N.L.R.B. 1062, 1063 (1967):
 
 
 31
 [The guidelines require that:] (1) the purpose of the poll is to determine whether the union enjoys majority support; (2) the purpose is communicated to the employees; (3) assurances against reprisals are given; (4) the employees are polled by secret ballot; and (5) the employer has not engaged in unfair labor practices or otherwise created a coercive atmosphere.
 
 
 32
 Thomas Industries, Inc., 687 F.2d at 869.
 
 
 33
 In this case, the Company did not meet the first Struksnes guideline. The Company failed to posit objective evidence that the Union suffered a loss of majority support. Thus, the Company cannot sustain its argument that the poll was a legitimate tool of inquiry. See Thomas Industries, Inc., 687 F.2d at 869. In addition, the Company did not meet the fifth Struksnes guideline. By failing to require the Ashtabula drivers to join the Union within 31 days of initial employment, pursuant to the terms of the collective bargaining agreement, the Company engaged in an independent unfair labor practice that created a coercive atmosphere in the workplace. See id. at 869. Thus, the Company cannot sustain its argument that the poll was non-coercive. We conclude that the Board reasonably found that the Company's polling and interrogation of its employees constituted a violation of the Act.
 
 V.
 
 34
 For the foregoing reasons, ENFORCEMENT of the Board's order is granted.
 
 
 
 [1]
 The Company's arguments based on the equitable doctrines of laches and estoppel, like its Section 10(b) argument, are unpersuasive. All three of these arguments lack an essential element--knowledge. No proof has been offered to show that the Union knew or had reason to know, prior to May, 1984, that the Company had changed the status of the non-union Ashtabula drivers and had failed to require them to join the Union, thus violating the collective bargaining agreement