983 F.2d 1068
 142 L.R.R.M. (BNA) 2704
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
NATIONAL ROOF SYSTEMS, INC., Petitioner, Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner.
 Nos. 92-5119, 92-5332.
 United States Court of Appeals, Sixth Circuit.
 Jan. 5, 1993.
 
 Before MILBURN and BATCHELDER, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Petitioner National Roof Systems, Inc., seeks review, and the National Labor Relations Board ("Board") seeks enforcement, of a Board decision and order, which found that the petitioner violated federal labor law by refusing to recognize and bargain with a certified union, by discharging an employee for refusing to sign an anti-union petition, and by threatening to discharge other employees for refusing to sign the anti-union petition. On appeal, the principal issues are: (1) whether substantial evidence supports the Board's finding that petitioner violated § 8(a)(5) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(5), by refusing to execute an alleged collective bargaining agreement between petitioner and the certified union; (2) whether substantial evidence supports the Board's finding that petitioner violated § 8(a)(1) of the NLRA, 29 U.S.C. § 158(a)(1), by coercively interrogating and polling its employees about whether or not the company should remain a union contractor; and (3) whether substantial evidence supports the Board's finding that petitioner violated § 8(a)(1) of the NLRA by threatening employees with discharge if they did not sign an anti-union petition and also violated § 8(a)(3) of the NLRA, 29 U.S.C. § 158(a)(3), by discharging an employee who refused to sign the anti-union petition. For the reasons that follow, the petition for review is denied and enforcement of the Board's order is granted.
 
 I.
 A.
 
 2
 Petitioner is engaged in the construction industry, primarily in the installation and repair of roofs. Petitioner's principal place of business is located in Homer, Michigan. Petitioner has had a collective bargaining agreement with various locals of the United Union of Roofers, Waterproofers & Allied Workers, AFL-CIO ("Union"), since 1986. Sometime in 1986, petitioner became a signatory to a collective bargaining agreement with Local 166 of the Union in the Lansing, Michigan, area. In 1988, Local 166 merged into Local 70, which became the representative of petitioner's workers in the Lansing area. Petitioner and Local 70 were parties to a collective bargaining agreement covering the Lansing and Ann Arbor, Michigan, areas. The agreement expired either on May 31 or June 1, 1989. Petitioner had another collective bargaining agreement with Local 225 from the Battle Creek and Kalamazoo, Michigan, areas. The agreement with Local 225 covered Kalamazoo and four adjoining counties and was effective from June 1, 1987, to June 1, 1989. Effective May 1, 1989, Local 225 merged into Local 70.
 
 
 3
 By letter dated May 12, 1989, William Barber, the Business Manager of Local 70, notified the businesses which had collective bargaining agreements with Local 225 of the merger of the two Locals. The letter also notified the businesses that Barber was the only person authorized to "set up meetings for contract negotiations or sign a contract agreement" for the Union.
 
 
 4
 During a telephone conversation held in early May, 1989, Barber and petitioner's vice-president, Darrell Backinger, agreed to joint negotiations with other companies which had collective bargaining agreements with Local 225. A few days later, Backinger telephoned Barber and informed him that only Smith-Graham Roofing, Inc., was willing to jointly negotiate a new collective bargaining agreement. Backinger told Barber that he would speak to Terry Cleland, the president of Smith-Graham, and would get back to Barber with a meeting date. Subsequently, Barber, Backinger, and Cleland agreed to conduct their first bargaining session on May 19, 1989, at Cleland's place of business in Battle Creek, Michigan.
 
 
 5
 Prior to this time, in April 1989, Backinger wrote to Richard Zackoff, the President of the National Roofers Union, expressing his concerns regarding the rise of nonunion contractors in western Michigan, the lack of union activity in opposition to this encroachment, and the disparity between union and nonunion wages. Backinger stated that the nonunion contractors were paying a minimum of $3.00 per hour less than the union contractors with no benefits.
 
 
 6
 Present at the May 19 meeting were Barber and Tom Curry, president and business agent of Local 70, as well as Backinger and Cleland. Three members of former Local 225 also attended, but did not participate in the negotiations.
 
 
 7
 At the negotiations, Backinger and Cleland first stated that they were concerned about the fact that the great majority of their competitors in the Kalamazoo area were nonunion. Barber replied that the Union understood the problem and that it planned to increase its organizing activities in the area. The union representatives gave Cleland a copy of the Local 70 Lansing area collective bargaining agreement to use as a frame of reference for contract language. Backinger was not given a copy of the contract because he was familiar with the contract language.
 
 
 8
 The union officials stated that they wanted a long-term agreement. They stated that the Union wanted to standardize benefits for all workers who were members of Local 70 and that in order to do so, they would need an increase of approximately $2.00 per hour during the first year of the contract. Backinger and Cleland countered that they were interested in a short-term contract and were looking for approximately $2.00 per hour in concessions from the Union. At that first meeting, the participants also discussed travel pay, foremen's pay, seniority, and an apprenticeship program.
 
 
 9
 At the conclusion of the two-hour meeting, the union officials asked the contractors to review the Lansing area contract as a basis for further negotiations. The contractors agreed to do so, and the parties also agreed to meet at the same location on May 24, 1989. During the interval between the two meetings, Backinger and Cleland met at lunch to discuss the union's proposals. Cleland acknowledged that the Local 70 Lansing area contract was reviewed at that time, but Backinger denied this.
 
 
 10
 The May 24 meeting was attended by Barber, Curry, Backinger, and Cleland. The parties agreed to use the language of the Lansing area contract and also agreed to a three-year term for the contract. Cleland raised several issues at the meeting. The union accepted his proposal that foremen's pay not go into effect until there were at least three employees working at a job site. The union also agreed to Cleland's and Backinger's proposal that the travel zone, the mileage traveled by the workers before the contractors were required to pay travel expenses, be increased from 20 to 25 miles. Further, a point of origin for calculating travel pay for each of the contractors was agreed upon. The parties also agreed to eliminate "pitch pay," which increased the salary rate when a certain type of tar was used by the workers. Further, to increase competitiveness, the union agreed to eliminate seniority from the new contract.
 
 
 11
 With regard to the monetary issues, Cleland stated that the increase requested by the union would create problems for him because he had already entered into contracts based on the rates in the previous agreement. The union officials stated that if Cleland submitted a list of those contracts to them, they would explain to the workers that they would be paid under the previous agreement for construction work contracted before the new agreement.
 
 
 12
 Additionally, the union officials explained that since the proposed increases in the contract were for benefits, they would not be taxable as wages. The union further asserted that in order to induce the employees of nonunion contractors to enter the union, it would have to have an attractive insurance and retirement program for its members.
 
 
 13
 At that point, the parties then agreed to an increase of $2.00 per hour for the first year of the contract and $.80 per hour for each of the final two years of the contract. The union also agreed to include a reopener at the end of the second year of the contract.
 
 
 14
 At the end of the meeting the parties reviewed all of the issues which had been discussed to ensure that they were in agreement. According to Barber and Curry, at the end of this meeting the parties had reached a full agreement on a new three-year contract, subject only to ratification. The union officials told Backinger and Cleland that they would take the agreement before the membership for a ratification vote at the union meeting on May 30, and, if ratified, would have the agreement typed and brought to each of them for their signatures. Cleland and Backinger denied that the parties had reached agreement on a full contract at the meeting. Moreover, Backinger denied that the union indicated that it planned to take the agreement to the membership for a ratification vote.
 
 
 15
 However, on or about May 29, 1989, petitioner's attorney, George Brannick, called Barber and told him that he represented petitioner and wanted to set up a schedule for negotiations. Barber told Brannick that an agreement had already been negotiated and was scheduled for ratification the next day. Brannick stated that he would talk to Backinger and get back to Barber. Barber then telephoned Backinger and asked why he had his attorney call about negotiations when a contract had been agreed upon and was scheduled for a ratification vote. Backinger replied that his employees were not satisfied and were going to vote to decertify the union.
 
 
 16
 The union membership ratified the agreement on May 30, 1989. On or about June 1, 1989, Barber took a copy of the typed contract to Backinger to be signed. Backinger said that while he did not have any problems with the contract, he had to consider the wishes of his employees who wanted to go nonunion. Barber told Backinger to review the contract to make sure it represented what had been negotiated and that he would get back with him later for his signature.
 
 
 17
 Immediately thereafter, Barber and Curry took a copy of the typed contract to Cleland for his signature. Cleland reiterated that he was concerned about including the agreement on pay for employees on construction projects for which he had already contracted. Barber and Curry assured him that he would not be required to pay the new wage rates for jobs previously contracted. The contract was left with Cleland for proofreading. Approximately one week later, Cleland signed the contract in behalf of Smith-Graham Roofing, Inc. Cleland acknowledged at the hearing before the ALJ that the contract he signed was consistent with everything agreed to during negotiations except for a typographical error involving travel pay, which was corrected. Backinger has never signed the contract.
 
 
 18
 Meanwhile, on or about June 1, 1989, Backinger gathered National Roof System, Inc.'s employees in the company offices to discuss their union representation and the recent negotiations. In addition to Backinger, his brothers, Ron and Doug Backinger, attended the meeting along with foreman Charlie Bowers. The employees attending were Michael Silveus, Brian Drake, Alan Luke, Donnie Luke, and Luther Luke. Backinger told the employees he was interested in knowing whether they wanted to remain in the union. Backinger then went around the room asking for the employees' responses. Michael Silveus said that he could not decide that quickly. When Backinger asked Brian Drake what he wanted to do, Drake said that he wanted to stay in the union. Backinger then told the employees to go outside and decide what they wanted to do. Drake and the three Lukes then went outside to discuss whether they wanted to remain in the union and later returned to the office.
 
 
 19
 Backinger complained that the wages and benefits just negotiated were too expensive and said the employees could do as well or better without the union. Backinger asked the employees whether it was worth it for him to keep talking with the union or whether he should "just tell them to shove it". At that point, Silveus overheard Backinger telling his brothers, Ron Backinger and Doug Backinger, who were employed by petitioner, that he thought he could get out of the contract he had agreed to. Backinger also attempted to make a telephone call to Cleland to see if Smith-Graham was going to stay union or go nonunion.
 
 
 20
 By letter dated June 1, 1989, petitioner's attorney, Brannick, informed the union's attorney, Neil Hirshberg, that "a serious question arises concerning representation" by Local 70 of the employees of both petitioner and Smith-Graham. The letter stated that petitioner had received no documentation that Local 70 was the successor to Local 225 and that when such documentation was presented, he would arrange negotiation meetings with the union where he would act as chief spokesman for petitioner.
 
 
 21
 On Friday, June 2, 1989, Backinger went to a jobsite and handed out paychecks to employees working at that location. While there, he approached Silveus and handed him a piece of paper to sign. The document stated that the signatory wished to resign from the union. Backinger had instructed one of the clerical employees at his office to prepare the document. According to Silveus, Backinger told him that if he did not sign the document, he could no longer work for him. Silveus replied that he wanted to think about it over the weekend and would let Backinger know on Monday morning. Backinger admitted the substance of Silveus's testimony; however, he denied making the discharge threat. Backinger's testimony was corroborated by Luther Luke, who was nearby when Backinger asked Silveus to sign the anti-union petition. Backinger also told Drake that petitioner was going nonunion the following Monday and that he could work with him as a nonunion employee or stay with the union and work elsewhere. At least three employees signed the petition.
 
 
 22
 The next workday, Monday, June 5, 1989, Silveus drove a company van to a shopping center parking lot where he normally picked up employees to drive to the jobsite. When Silveus arrived at the parking lot, the other company employees who had signed the anti-union petition were already seated in another van. Silveus testified that he did not wear his usual work clothes because he was not going to sign the petition. He testified that he would have worked in the clothes he was wearing had Backinger permitted him to do so. Backinger approached Silveus with the anti-union petition and asked him if he was going to sign it. Silveus stated that he would not. Backinger then told Silveus to drive the van back to the company offices, which he did. When Silveus arrived at the shop with the van, Darrell Backinger was already there. He asked Silveus what he would be doing, and Silveus stated he would be working on a new construction job. Since Silveus had no way home, one of Backinger's brothers drove him to his home as he had requested.
 
 
 23
 Subsequently, the union filed unfair labor practice charges against petitioner, alleging violations of sections 8(a)(1), (3), and (5) of the NLRA based upon petitioner's refusal to sign the alleged collective bargaining agreement as well as petitioner's coercive interrogation of its employees and the discriminatory discharge of an employee.
 
 
 24
 A hearing was held before an Administrative Law Judge ("ALJ") on January 22 and 23, 1990, in Ann Arbor, Michigan. In a decision dated June 7, 1991, the ALJ found that petitioner violated the Act.
 
 
 25
 The Board, in a decision and order dated December 30, 1991, adopted the recommended decision of the ALJ. The Board found that petitioner (1) violated § 8(a)(5) and (1) of the NLRA by refusing to execute the agreement it had made with the union and by withdrawing recognition from the union; (2) violated § 8(a)(1) of the NLRA by coercively interrogating and polling employees, circulating a petition seeking the revocation of the union's representative status, and threatening employees with the loss of employment for failing or refusing to sign the anti-union petition; and (3) violated § 8(a)(3) and (1) by discharging Michael Silveus because he refused to sign the anti-union petition.
 
 
 26
 Petitioner has filed a petition for review of the Board's decision with this court (Case No. 92-5119). The Board has filed a cross-application for enforcement of its order (Case No. 92-5332).
 
 II.
 A.
 
 27
 Petitioner first challenges the Board's finding that it violated § 8(a)(5) of the NLRA by refusing to execute the collective bargaining agreement which it had allegedly agreed to during negotiations with the union. Petitioner asserts that substantial evidence does not support the Board's finding of a § 8(a)(5) violation because it is based upon the ALJ's decision to credit the testimony of the union's witnesses and discredit petitioner's witnesses, which is not supported by the record or logic.
 
 
 28
 Where there is substantial evidence on the record as a whole to support the Board's conclusions, they may not be disturbed on appeal by this court. 29 U.S.C. § 160(e); Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488, (1951). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." Universal Camera, 340 U.S. at 488. This court will consider the evidence contrary to the Board's conclusions, but it may not conduct a de novo review of the record. Union Carbide Corp. v. N.L.R.B., 714 F.2d 657, 660 (6th Cir.1983).
 
 
 29
 The Board's application of the law to particular facts is also reviewed under the substantial evidence standard, and the Board's reasonable inferences may not be displaced on review even though the court might justifiably have reached a different conclusion if the matter were before it de novo. Universal Camera, 340 U.S. at 477.
 
 
 30
 When there is a conflict in the testimony, "it is the Board's function to resolve questions of fact and credibility." This court ordinarily will not disturb credibility evaluations by an ALJ who observed the witnesses' demeanor. N.L.R.B. v. Baja's Place, 733 F.2d 416, 421 (6th Cir.1984) (per curiam). This court accepts the Board's or the ALJ's credibility determinations unless it is clear that there is no rational basis for them. N.L.R.B. v. Pittsburgh S.S. Co., 337 U.S. 656, 660 (1944). Credibility determinations of the ALJ must be afforded considerable weight upon review, and this court should ignore them only when the Board "oversteps the bounds of reason." N.L.R.B. v. Mt. Vernon Telephone Co., 352 F.2d 977, 979 (6th Cir.1965).
 
 
 31
 An employer violates section 8(a)(5) if he refuses to execute a collective bargaining agreement whose terms have been agreed to by both parties. See Local 512, Warehouse and Office Workers' Union v. N.L.R.B., 795 F.2d 705, 712 (9th Cir.1986). The existence of an agreement is a question of fact for the Board to determine. N.L.R.B. v. International Credit Serv., 651 F.2d 1172, 1174 (6th Cir.1981) (order). Technical rules of contract formation do not control whether a collective bargaining agreement has been reached. Local 512, 795 F.2d at 713.
 
 
 32
 The ALJ's finding of the existence of a collective bargaining agreement was based upon his determination to credit the testimony of Barber and Curry over the testimony of Backinger and Cleland. Based upon the record, it cannot be said that no rational basis exists for the ALJ's determination. First, the ALJ based his credibility determination, in part, on the demeanor of the witnesses, a finding which is given great deference by this court due to the fact that it is essentially unreviewable. The ALJ also found that the testimony of Barber and Curry was mutually corroborative and internally consistent with the record as a whole.
 
 
 33
 Despite minor differences, the testimony of Barber and Curry was corroborative and consistent. Defendant argues, however, that the greatest weight should have been accorded to Cleland's testimony, because he was the only disinterested witness of record. However, Cleland denied that the parties reached an agreement at the May 24, 1989, negotiations. Nonetheless, Cleland's own actions were at odds with his testimony. When presented with the typed copy of the contract allegedly agreed to at the May 24 negotiations, Cleland signed the contract without further negotiations and with only a single change resulting from a typographical error.
 
 
 34
 Petitioner also places great weight on the April 1989 letter which Darrell Backinger sent to the president of the National Roofers Union complaining about the presence of so many nonunion contractors in Michigan. However, the letter does not preclude the possibility that the parties reached an agreement in this case. Despite the April 1989 letter, the record shows that Backinger met with the union at two negotiation sessions in May 1989.
 
 
 35
 Thus, a rational basis in the record does exist for the ALJ's credibility determinations. Moreover, since the credibility determinations are the basis for the ALJ's finding of a § 8(a)(5) violation, substantial evidence supports the ALJ's finding in this regard.
 
 B.
 
 36
 Petitioner next challenges the ALJ's determination that petitioner violated §§ 8(a)(1) and (3) of the NLRA by threatening to terminate employees and by terminating Michael Silveus for refusing to sign the anti-union petition. Petitioner asserts that the record shows that Silveus voluntarily terminated his own employment and that no threats of discharge were made. It is a violation of §§ 8(a)(1) and (3) of the NLRA for an employer to discriminate against employees or to discourage union membership, Turnbull Cone Baking Co. of Tennessee v. N.L.R.B., 778 F.2d 292, 296 (6th Cir.1985) (per curiam), cert. denied, 476 F.2d 1159 (1986), or to discharge an employee because of his union activities, N.L.R.B. v. Allen's I.G.A. Foodliner, 651 F.2d 438, 440 (6th Cir.1981).
 
 
 37
 However, an employee's discharge is not unlawful if the employer's anti-union animus did not contribute to the discharge. N.L.R.B. v. Transportation Management Corp., 462 U.S. 393, 398 (1983). Accordingly, once the General Counsel demonstrates that an employee's protected activity was a substantial or motivating factor in the adverse action, an employer can avoid liability if it can prove by a preponderance of the evidence that there were independent legitimate reasons for the decision. Id. at 398-401.
 
 
 38
 In this case, no independent legitimate reason for Silveus's termination was advanced. Rather, the circumstances of his termination, particularly its abruptness and timing, indicate a motive to squelch protected activity. See N.L.R.B. v. Downslope Indus., Inc., 676 F.2d 1114, 1118 (6th Cir.1982). Moreover, the circumstances of his discharge also show that Silveus did not voluntarily terminate his employment and that he was threatened with discharge.
 
 
 39
 Silveus reported for work on Monday, June 5, 1989. At that point in time, he was confronted with an anti-union petition which he refused to sign. He had been confronted with the same petition the previous working day, Friday, June 2, and allegedly was told that if he did not sign the petition, he could not work for petitioner. Immediately after refusing to sign the petition, Silveus was told to drive the company van back to the office; he was not permitted to join his co-workers in traveling to the job site. When Silveus arrived at the office, Darrell Backinger was already there and he asked Silveus where he would be working. Thus, Backinger's language indicated to Silveus that he had been terminated for refusing to sign the anti-union petition. Nowhere in these events is there a suggestion that Silveus could have continued his employment with the petitioner if he had not signed the anti-union petition. Moreover, although Silveus did not wear his usual work clothes on that Monday morning, his uncontradicted testimony was that he would have worked in the clothes he was wearing if he had been permitted to do so. Therefore, there is no evidence of record that suggests Silveus voluntarily terminated his employment with petitioner.
 
 
 40
 Furthermore, a rational basis does exist in the record for the ALJ's determination to give greater credibility to Silveus' testimony that he was threatened with discharge if he did not sign the anti-union petition. Although Luther Luke testified that he overheard Backinger's conversation with Silveus and no threat of discharge was made, this testimony is simply inconsistent with the record. Silveus was approached on Friday, June 2, with the anti-union petition. He declined to sign it stating that he wanted to think it over during the weekend. Silveus alleges that the threat of discharge was made at that time. The following Monday Silveus was immediately terminated when he reported to work and refused to sign the petition. Moreover, the record shows that during the interval between Friday and Monday, Silveus contacted Tom Curry at the union in an effort to ensure employment with another employer if he did not sign the anti-union petition.
 
 
 41
 Therefore, substantial evidence supports the ALJ's conclusion that Silveus was threatened with discharge if he did not sign the anti-union petition and that he was terminated for his refusal to sign the anti-union petition. Consequently, substantial evidence supports the ALJ's finding of a violation of §§ 8(a)(3) and (1) of the NLRA.
 
 C.
 
 42
 Finally, petitioner argues that substantial evidence does not support the Board's finding that Backinger coercively interrogated and polled his employees. Petitioner asserts that the context in which the questioning of the employees occurred suggests no coercion.
 
 
 43
 It is a violation of section 8(a)(1) for an employer to coercively interrogate employees about their support for a union or to conduct a poll of employee sentiment concerning union representation. See N.L.R.B. v. Price's Pic-Pac Supermarkets, Inc., 707 F.2d 236, 239 (6th Cir.1984) (per curiam); Thomas Indus., Inc. v. N.L.R.B., 687 F.2d 863, 867 (6th Cir.1982).
 
 
 44
 An employer violates section 8(a)(1) when the employer's conduct, considered in the total context in which the challenged conduct occurs from the standpoint of its impact upon the employees, tends to be coercive or tends to interfere with the employees' exercise of their rights. See N.L.R.B. v. Okun Bros. Shoe Store, Inc., 825 F.2d 102, 105 (6th Cir.1987), cert. denied, 485 U.S. 935 (1988). Such an assessment should take into account "the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." See Peabody Coal Co. v. N.L.R.B., 725 F.2d 357, 363 (6th Cir.1984).
 
 
 45
 Moreover, although an employer may poll its employees to determine their union sentiment if it has substantial, objective evidence of a loss of union support, Thomas, 687 F.2d at 867, the guidelines for such polling require (1) that the purpose of the poll must be to determine whether the union enjoys majority support, (2) that the purpose is communicated to the employees, (3) that assurances against reprisals are given, (4) that the employees are polled by secret ballot, and (5) that the employer has not engaged in unfair labor practices or otherwise created a coercive atmosphere. Id.
 
 
 46
 In this case, because petitioner had already entered into a collective bargaining agreement with the union, it was prohibited from challenging the union's majority status during the term of that agreement absent a valid petition to decertify the union via a Board-conducted election. See John Deklewa & Sons, 282 NLRB 1375, 1385 (1987), enforced, 843 F.2d 770 (3d Cir.), cert. denied, 488 U.S. 889 (1988).
 
 
 47
 Moreover, even absent a valid collective bargaining agreement, petitioner violated § 8(a)(1) via coercive interrogation and polling. On June 1, Backinger called the employees into his office and asked them, apparently questioning each one of them, as to whether they wished to remain in the union. Further, Backinger personally presented the anti-union petition, which he had prepared, to his employees, thereby ensuring that when all employees had been approached, he would be aware of the position of each of them with regard to the union. Therefore, substantial evidence supports the Board's conclusion that petitioner violated § 8(a)(1) by coercively interrogating and polling its employees.
 
 III.
 
 48
 For the reasons stated, the petition for review is DENIED, and the Board's cross-application for enforcement of its order is GRANTED.