NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

WALLKILL VALLEY GENERAL HOS-
PITAL, a/k/a Alexander Linn
Hospital Association, Respondent.

No. 88–3443.

United States Court of Appeals,
Third Circuit.

Argued Dec. 12, 1988.
Decided Jan. 30, 1989.

Susan L. Williams, Supervisory Atty.,
Fred L. Cornnell (argued), Atty., N.L.R.B.,

Washington, D.C., Rosemary M. Collyer, General Counsel, Robert E. Allen, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, for petitioner.

James B. Clark (argued), Yauch, Peterpaul, Clark & Vitolo, Springfield, N.J., for respondent.

Before GIBBONS, Chief Judge, HUTCHINSON and ROSENN, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Chief Judge:

The National Labor Relations Board petitions to enforce its March 23, 1988 order issued against Wallkill Valley General Hospital, a/k/a Alexander Linn Hospital Association (the Hospital). The order requires the Hospital to cease and desist from the violations it found, and to recognize and bargain with the Hospital, Professional and Allied Employees of New Jersey (the Union) as the collective bargaining representative of the Hospital's registered nurses. The violations found by the Board include withdrawing recognition, refusing to bargain, making unilateral changes in the terms and conditions of employment, and dealing directly with employees in the bargaining unit. We will enforce the Board's order.

## I.

In July of 1977 the Union was certified by the Board as the collective bargaining representative of two units, one of which was the registered nurses, at the Alexander Linn Hospital in Sussex, New Jersey. Following the certification, Alexander Linn Hospital bargained with the Union. The parties did not reach agreement, however, until after an economic strike which lasted from February 1, 1978 through March 31,

1978. A collective bargaining agreement, effective from January 1 through December 31, 1978 ended the strike.

The Union filed with the Board two unfair labor practice charges: one for subcontracting out, in March of 1978, work which resulted in the layoff of an employee in the hospital's technical employee unit, and one for discharging, in April 1978, a registered nurse for allegedly engaging in unprofessional conduct. Before these unfair labor practice charges were processed by the Board, Lorraine Simons, a member of the registered nurses bargaining unit, on September 29, 1978, filed with the Board's Regional Office a decertification petition with respect to that unit.[1] Simons told the Hospital administration that the petition was filed and that she felt there was a majority in the Registered Nurse unit who did not want the Union. Also on September 29, 1978 the Union wrote to the Hospital requesting negotiations for a contract to succeed that which would expire on December 31. The Hospital responded on October 5, 1978 that it questioned the Union's majority status because of the pending decertification petition. It also informed the Union that it intended to make certain wage adjustments in order to correct a payroll error.

On October 25, 1978, the Regional Director wrote to the Hospital advising that it intended to hold the decertification petition in abeyance pending the disposition of the Union's unfair labor practice charges. The Hospital sought Board review of the decision to hold the decertification proceeding in abeyance, but the Board declined review. The Hospital then asked the Regional Director to inform it whether the decertification petition was supported by a majority of the employees in the bargaining unit. It was the company's position that under *Telautograph Corp.*, 199 NLRB 892 (1972),[2] it had an obligation to refrain from collec-

---

1. A separate decertification petition was filed with respect to the technical employees unit. The General Counsel concedes that a merger destroyed this unit and that only the Registered Nurse unit is involved in this case.

2. Telautograph Corp., 199 NLRB 892 (1972), was prospectively overruled by the Board in Dresser Industries, Inc., 264 NLRB 1088 (1982), which holds that the filing of a decertification petition alone is not a sufficient showing of loss of majority status to relieve the employer of the duty to bargain.

tive bargaining with the Union if a majority in the bargaining union wished to decertify. The Regional Director responded on November 28, 1978, refusing to disclose this information because it was exempt from disclosure under exemptions 6, 7(A), 7(C) and 7(D) of the Freedom of Information Act. 5 U.S.C. § 552.

In November of 1978, while the collective bargaining agreement was still in effect, the Hospital surveyed its employees with respect to certain medical/dental and pension benefits which they did not then enjoy. In December the Hospital reduced wages of some bargaining unit employees to correct the payroll error to which it had made reference in its October 5, 1978 letter to the Union. These actions resulted in additional unfair labor practice charges by the Union and the General Counsel.

On January 2, 1979, two days after the collective bargaining agreement expired, the Hospital advised the Union that while it would process grievances which arose while that contract was in effect, it would not bargain with respect to a new contract because it questioned the Union's majority status. The refusal to bargain resulted in additional unfair labor practice charges by the Union and the General Counsel.

On March 26, 1979, an administrative law judge found that the Hospital had violated section 8(a)(5) and (1) of the Act, 29 U.S.C. § 158(a)(5) and (1) by subcontracting out work from the technical unit and by discharging an employee in the Registered Nurse unit. The Board subsequently agreed, and this court enforced the resulting order. *See Alexander Linn Hospital Ass'n*, 244 NLRB 387 (1979), *enforced mem.*, 624 F.2d 1090 (3d Cir.1980).

In April 1979, Alexander Linn Hospital reached an agreement to merge with the Franklin Hospital in Franklin, New Jersey. The merger became effective on May 3, 1979, with the resulting hospital named Wallkill Valley General Hospital. Before the merger the two facilities had different wages, benefits, and working conditions. Franklin Hospital employed fifteen registered nurses who were transferred to the Sussex facility. Before the merger was finalized, Hospital supervisors met with employees to discuss it and any resulting changes. During these meetings several Franklin nurses expressed the desire not to be represented by the Union. The transfer of the Franklin nurses to the Sussex facility increased the number of registered nurses at Sussex from approximately 60 to approximately 75.

On May 18, 1979, the Union requested the Hospital to negotiate for a new collective bargaining agreement. Three days later the Union wrote to the Franklin Hospital Nurses Club, an organization to which the registered nurses formerly employed at Franklin had belonged, advising that it represented the registered nurses and inviting the Franklin nurses to meet and discuss problems resulting from the merger. Rosemary Fatzinger, the President of the Franklin Hospital Nurses Club, responded that the Franklin nurses are "in total agreement that joining a union at this time is out of the question." A copy of Fatzinger's letter was sent to the Hospital. On May 24, 1979, the Hospital responded to the Union's request for collective bargaining that it would not negotiate because the Hospital had a serious and good faith doubt that the Union continued to represent a majority of the Hospital employees. The letter states that the good faith doubt was based on the following factors:

1. [The Union] engaged in a strike at Alexander Linn Hospital in early 1978, and out of approximately 90 employees in the Bargaining Units, only 28 did not work during the strike. The balance of the employees continued to work.

2. Several of the 28 employees who did not work during the 1978 strike were replaced.

3. There has been a turnover of employees in the Bargaining Units.

4. We received a Petition filed with the National Labor Relations Board by the employees of the Hospital and are informed that a majority of our employees have requested the National Labor Relations Board to hold an election to determine whether or not the [Union] continues to represent the employees.

5. There currently are 14 employees authorizing dues deduction from their salaries and remittance to the union out of approximately 150 employees in the combined Wallkill Valley General Hospital Units.

6. We understand that the employees at the Ambulatory Care Center of the Wallkill Valley General Hospital, after receiving an invitation from the [Union] have expressed almost unanimous rejection of the [Union].

7. The merger of Alexander Linn Hospital and Franklin Hospital into the Wallkill Valley General Hospital has created a new and more expanded Bargaining Unit to the extent that the number of employees authorizing dues deduction (14) out of a total of about 150 employees is less than 10% interest in the union.

Letter from Raffaele Marzella, Hospital Administrator, to Ann Twomey, Union President.

On June 25, 1979, the Hospital notified its employees, including the registered nurses, of changes in the terms and conditions of employment that would equalize wages and benefits for the employees of the Sussex and Franklin units. It also filed a petition with the Regional Director for an election to determine whether or not the Union continued to enjoy majority support. The Regional Director, on September 20, 1979, dismissed this petition without prejudice to its refiling upon final disposition of the pending unfair labor practice charges. The Hospital requested Board review of this dismissal. On October 12, 1979, the Board reinstated the petition, consolidated it with the decertification petition filed by Lorraine Simons, and ordered that the consolidated petitions be held in abeyance pending final disposition of the pending unfair labor practice charges.

Meanwhile, on June 28, 1979, the Union, and on August 17, 1979, the General Counsel, filed new unfair labor practice charges of refusal to bargain and unilateral changes in the terms and conditions of employment of bargaining unit employees. All the pending unfair labor practice charges were consolidated for hearing before an administrative law judge, who on December 31, 1980, dismissed them. In February of 1981, the General Counsel filed exceptions. The Hospital's response was filed on March 6, 1981.

Just over seven years after the Hospital's response to the General Counsel's exceptions was filed, the Board, on March 23, 1988, issued its final order against the Hospital. The Board found that the Hospital had violated section 8(a)(5) and (1) of the Act: (1) by bypassing the Union and making an employee benefit survey while the collective bargaining agreement was in effect, (2) by withdrawing recognition and thereafter refusing to bargain, and (3) by making unilateral changes in the terms and conditions of employment while the collective bargaining agreement was in effect, and after its expiration. The Board's order directs the Hospital to recognize and bargain with the Union as the bargaining representative for the Registered Nurse bargaining unit, and on request to rescind all unilateral changes in terms and conditions of employment. On July 8, 1988, the Board petitioned for enforcement.

The petitions for decertification and election remain in abeyance pending the outcome of this case.

## II.

The Hospital contends that the Board order should not be enforced. It urges that the benefit survey, taken while the collective bargaining agreement was in effect, did not undermine the Union, and therefore was not an unfair labor practice, that after the expiration of the collective bargaining agreement it had sufficient objective manifestation of the Union's loss of majority support that it could lawfully both refuse to bargain and withdraw recognition, and that even if there were unfair labor practices in 1978 and 1979, the seven-year delay by the Board in acting on the General Counsel's exceptions, and changed circumstances in the bargaining unit, preclude enforcement.

## A.

The employee benefit survey occurred in November of 1978, while the collective bargaining agreement was in effect. The Union had been certified in July of 1977, and in March of 1978, the Hospital, after an economic strike, entered into that agreement. From July of 1977, and thereafter during the term of a collective bargaining agreement not exceeding three years, the Union enjoyed an irrebuttable presumption of majority support. *Brooks v. Labor Board*, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954). Thus the Hospital cannot contend that the Union lacked majority support when the benefits survey was undertaken. The Board found that the timing and nature of the survey plainly showed that the Hospital sought to ascertain employee opinion prior to contract negotiations. Had the survey questions addressed issues outside the scope of employer-union negotiations the survey might have been lawful. In this instance, however, the Hospital inquired about medical and dental benefits over which the Hospital and the Union had negotiated unsuccessfully already. Moreover, shortly before the survey the Union had requested negotiations for a new contract. Thus the Board reasonably found that there was a possibility of renewed bargaining over the same issues. The Board's conclusion that in taking the survey the Hospital bypassed the Union and violated section 8(a)(5) and (1) of the Act is supported by substantial evidence.

## B.

The Board found that on May 24, 1974, the Hospital withdrew recognition of the Union. Under *Telautograph Corp.*, 199 NLRB 892 (1972), once Lorraine Simons filed a decertification petition, the Hospital was required to suspend bargaining for a successor contract.[3] The Board's caselaw has always been clear, however, that while *Telautograph* required the suspension of bargaining in face of a decertification petition, such a petition, standing alone, did not permit withdrawal of recognition. Rather, the employer's duty under the *Telautograph* rule, was simply to remain neutral and await resolution of the decertification dispute by the Board, before making unilateral changes in wages or working conditions. *E.g., Turbodyne Corp.*, 226 NLRB 522 (1976).

Before an employer can withdraw recognition, it must rebut the presumption of continued majority status by showing either that the Union has in fact lost majority support, or that there are objective considerations sufficient to support a reasonable and good-faith doubt that the Union still enjoys such support. *NLRB v. Frick Co.*, 423 F.2d 1327 (3d Cir.1970); *Terrell Machine Co. v. NLRB*, 427 F.2d 1088, 1090 (4th Cir.), *cert. denied*, 398 U.S. 929, 90 S.Ct. 1821, 26 L.Ed.2d 91 (1970); *accord Iron Workers, Local 3 v. NLRB*, 843 F.2d 770, 772 (3d Cir.1988). The Board concluded that the Hospital failed to carry its burden in this respect.

An employer may not avoid the duty to bargain by demonstrating a loss of majority status arising from its own unfair labor practices. *NLRB v. Frick Co.*, 423 F.2d 1327, 1333 (3d Cir.1970). The Hospital's first unfair labor practice occurred in March of 1978, prior to the end of the Union's economic strike. The Hospital relied, in its May 24, 1979 letter withdrawing recognition, on the fact that during that strike only 28 of 90 employees did not work.

In *Frick*, this court declined to accept similar reasoning. We noted that a return to work during an economic strike does not demonstrate rejection of a union as the returning workers' bargaining representative. *Id.* In this case the Hospital's reliance on the return to work by a number of employees as proof of loss of support is suspect, since it signed a collective bargaining agreement with the Union ending the strike. The Hospital also relied on the fact

3. Telautographic Corp. was overruled prospectively, in Dresser Industries, 264 NLRB 1088 (1982), which holds that the filing of a decertification petition neither requires nor permits an employer to refuse to bargain or execute a contract with an incumbent union.

that several of the 28 strikers who did not work were replaced. *Frick* also rejects this basis for proof of loss of majority status. *Id.* at 1334. The Hospital never learned the actual number of employees who supported the decertification petition. It nevertheless relied on statements by some bargaining unit employees that the petition was supported by a majority. The Board has held that reliance on such hearsay carries little weight. *American Federation of Television & Radio Artists*, 286 NLRB 135 (1987). The Hospital relied, as well, on the fact that only 14 out of 150 employees in the enlarged work force resulting from the merger of the Sussex and Franklin hospitals authorized dues checkoffs. The Board observed that there is a clear distinction between union membership and majority support for collective bargaining representatives. *See Retired Persons Pharmacy v. NLRB*, 519 F.2d 486, 491 (2d Cir.1975) (the issue is "not how many employees belong to the union or paid dues but rather whether the majority desired union representation for purposes of collective bargaining"). Finally, the Hospital relied on turnover of employees in the bargaining unit. The Board found, however, no evidence of employee turnover between the July 1977 date of certification and the May 24, 1979 withdrawal of recognition.

We conclude that the Board's finding that the Hospital failed to establish a good faith reasonable doubt, as of May 24, 1979, as to the Union's continuing majority status is supported by substantial evidence. The presumption of continued majority support therefore was not rebutted, and the finding of an unfair labor practice must stand.

### C.

The Hospital's final contention is the most disturbing of the three. Under the *Telautograph* rule, since overruled, the filing of the decertification petition by an employee required that the Hospital refrain from collective bargaining but preserve the status quo with respect to terms and conditions of employment. The Board reason-

ably concluded that the decertification matter be deferred until after the resolution of pending unfair labor practice charges. The resolution of the decertification matter was prevented, however, by a totally unexplained delay of over seven years between the date of the Hospital's response to the General Counsel's exceptions to the administrative law judge's decision and the date of the Board's order. According to the Board, the Hospital could neither bargain nor act unilaterally with respect to terms and conditions of employment during the entire time that the unfair labor practice charges were pending before it.

Indeed the Board's order directs that the Hospital, on request, rescind all unilateral changes found to be unlawful. Realistically, of course, there will be no request by the Union to rescind changes in terms and conditions of employment which were favorable to employees. Thus employee interests probably were not adversely affected by the Board's delay, except with respect to the delay in disposing of the (still unresolved) decertification petition.

As to the employer's interest, the authorities prevent taking that interest into account. "The Board is not required to place the consequences of its own delay, even if inordinate, upon wronged employees to the benefit of wrongdoing employers." *NLRB v. J.H. Rutter–Rex Manufacturing Co.*, 396 U.S. 258, 265, 90 S.Ct. 417, 421, 24 L.Ed.2d 405 (1969). This court has held that a "[m]ere lapse of time ... is not grounds to deny an order of the Board." *St. John's General Hospital v. NLRB*, 825 F.2d 740, 746 (3d Cir.1987). Confessing a certain amount of unease over the application of that rule in these circumstances, we are nevertheless bound to apply it.

### III.

The Board's order is supported by substantial evidence and there are no grounds for denying its enforcement. The order will be enforced in full. In the circumstances of this case, however, the enforcement order shall be conditioned upon the Board giving employees in the bargaining unit actual notice of their statutory right to

petition for a decertification election. *See NLRB v. Patent Trader, Inc.,* 426 F.2d 791 (2d Cir.1970).