HAJOCA CORPORATION,
Petitioner—No. 88–3707
and Cross–Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent and
Cross–Petitioner—No. 88–3738.

Nos. 88–3707, 88–3738.

United States Court of Appeals,
Third Circuit.

Argued April 3, 1989.

Decided April 26, 1989.

Walter H. Flamm, Jr., Jeffrey A. Smith (argued), Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for petitioner/cross-respondent Hajoca Corp.

Collis Suzane Stocking, Supervisory Atty. NLRB Julie Brock Broido (argued), Atty. NLRB Rosemary M. Collyer, Gen. Counsel NLRB, Robert E. Allen, Associate Gen. Counsel NLRB, Aileen A. Armstrong, Deputy Associate Gen. Counsel NLRB, Washington, D.C., for respondent/cross-petitioner N.L.R.B.

Before GIBBONS, Chief Judge, BECKER and NYGAARD, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Chief Judge.

Hajoca Corporation petitions to have set aside a September 30, 1988 order of the National Labor Relations Board. The order requires Hajoca to cease and desist from the violations it found and bargain with Truck Drivers and Helpers, Teamsters Local Union No. 312. The violations found include polling the Union's members, withdrawing recognition, refusing to bargain, dealing directly with the employees in the bargaining unit, and threatening the employees with the permanent loss of their jobs. We will deny Hajoca's petition and enforce the Board's order.

I

Hajoca, a nationwide distributor of plumbing and heating supplies, operates a distribution facility in Chester, Pennsylvania. The company employed two drivers and several warehousemen at this facility until July 1986. Local 312 represented the two drivers. Local 690 of the Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada represented the warehouse employees.

Hajoca was party to a series of concurrent three-year collective bargaining agreements with each union, the most recent of which remained in effect through June 30, 1986. In negotiating previous contracts, Local 312 generally followed the lead of Local 690 and Hajoca, which belonged to a multi-employer plumbing suppliers' association at the time. Although Hajoca withdrew from the multi-employer association in 1985, Local 690 continued to seek the same wage package for its Chester facility warehousemen as employees covered by the multi-employer contract received. At no time, however, did the multi-employer contract directly cover the Chester facility drivers.

On May 28, 1986, Eugene Strine, Hajoca's northeast regional manager, and Vincent Ezzo, the general manager of the Chester facility, met with Timothy Lehman, Local 312's secretary-treasurer, and presented the company's first formal proposal for a renewal contract. The proposal called for a 30–cent per hour cut in the drivers' wages for the first year of the contract, a restoration of the 30–cent per hour cut in the second year, and a 30–cent per hour increase in the third and final year. The parties agreed only to meet for further negotiations.

On June 12, 1986, as scheduled, Local 312 presented its counter-proposal. In attendance at this meeting were Strine, Ezzo, Lehman, and Vincent Borreggine, who was both a union shop steward and one of the drivers. After declaring that Local 312 "wasn't interested in any give-backs," Lehman proposed a two-dollar per hour wage increase for each year of the contract. Lehman did state, however, that Local 312 might be willing to accept the wage package about to be negotiated between Hajoca and Local 690. Neither Strine nor Ezzo indicated that Hajoca's wage position had changed since the company's original proposal. The parties scheduled another negotiating session for June 30, 1986, the day the contract was due to expire.

On that date, Strine told Lehman that he could not make the meeting they had scheduled since he was tied up in negotiations with Local 690. As a provisional solution, the two agreed by telephone that the

drivers would continue to work on a day-to-day basis under the same terms as the expiring contract, and that the successor agreement would be applied retroactively. They further agreed that negotiations would resume after Hajoca settled with Local 690.

On July 2, 1986, before any further meeting with Local 312, Hajoca took its case directly to the employees. It did so by means of meetings called by Ezzo at Strine's instruction. The others present included David Little, the other driver, and three of the warehousemen. Borreggine did not attend initially since he was making a delivery at the time. At the first meeting, Ezzo declared that he would review Hajoca's collective bargaining position "as it was," and set forth what he termed the "company's side of a new proposal." The proposal called for a wage freeze for the first year of the contract, and at the end of the first year, renegotiation for the final two years. At least one employee pointed out that Ezzo should be presenting his proposal to the two union locals rather than to the employees, to which Ezzo responded that he just wanted to tell the company's side of the story. No Hajoca official had first discussed the wage freeze proposal with any Local 312 official before the meeting.

Later that evening, Ezzo held a second meeting with another warehouse employee and Borreggine, who had since returned. Ezzo reiterated the wage-freeze proposal, prompting Borreggine to ask whether anyone from Hajoca had talked to Local 312 about it. Ezzo replied that Strine was supposed to have contacted union officials earlier in the day. Borreggine stated that he had no authority to accept or reject any agreement, and that Hajoca should negotiate through the union in any case. According to Borreggine's testimony, Ezzo responded that unless Local 312 "went along" with the new proposal, the employees "would no longer have a job," and "would all be replaced with non-union employees." Ezzo added that Hajoca "had the applications ready," and people "lined up" waiting to "take" the jobs.

Hajoca did not meet with Local 312 until a joint session with both locals on July 9, 1986. Strine and Ezzo began the meeting by explaining that for economic reasons, Hajoca could not agree to the same settlement that Local 690 had negotiated with the multi-employer association, to which the company no longer belonged. The Hajoca officials then floated various proposals: first the original wage-cut plan of May 28; then the wage-freeze first discussed with the employees; and finally a proposal for a three-year contract with a 30-cent per hour increase in each of the three years. Both unions rejected each of these offers.

The next day, July 10, 1986, Local 690 began an economic strike against Hajoca and picketed the company's Chester facility. Borreggine and Little, the two Local 312 drivers, refused to cross the picket lines, yet neither did they or any other Local 312 member participate in the picketing at any time. The two drivers did refuse to report for work after July 10, and by November each had found comparable employment for higher wages. Also by November, Hajoca had hired two employees, William Moss and Gerald Gillette, as replacement drivers. Each man had previously been a member of Local 312. Ezzo, however, told Gillette when hiring him that he would no longer be represented by a union because of the strike. Local 690's picket remained in place through the winter of 1987, and Gillette and Moss crossed the line as a matter of course. On several occasions Moss openly criticized the pickets, calling them "jerks" and remarking that they were "crazy" to be out there picketing while the rest were inside working.

On February 9, 1987, Ezzo called a meeting of some of the replacement workers for the purpose of conducting a poll of union support. Replacement driver Gillette and two of the warehousemen attended. Moss, who was sick on leave recuperating from a broken leg, was absent from the meeting. In his stead appeared Henry Collins, who had been initially hired as a warehouseman, but took over for Moss during the latter's convalescence. A paralegal for Hajoca's law firm conducted the poll by distributing

secret ballots to Gillette and Collins. The ballots contained the single question: "Do you consider Local 312 to be your representative?" Both ballots came back marked "no."

A few days earlier, Local 312 had requested that contract negotiations resume. On February 11, 1987, Hajoca rejected this demand and withdrew its recognition of Local 312 on the grounds that the union did not represent the majority of workers in the drivers bargaining unit.

Local 312 filed with the Board two unfair labor practice charges relating to the incidents of July 2, 1986 and February 9, 1987. In a charge filed in July 1986, the union alleged that Hajoca had negotiated directly with employees and had threatened them with the permanent loss of their jobs. In a charge filed in February 1987, Local 312 also alleged that the company had unlawfully polled its employees and withdrawn recognition. The Board's Regional Director had approved an informal settlement of the first charge prior to the filing of the second charge. With the filing of the later charge, the Regional Director withdrew his approval and consolidated both matters into a single complaint.

On September 30, 1988, the Board, agreeing with the administrative law judge in the result, found that Hajoca's employee poll violated section 8(a)(1) of the National Labor Relations Act 29 U.S.C. § 158(a)(1). The Board, again in agreement with the judge, also found that Hajoca had violated section 8(a)(1) and (5) of the Act by refusing to bargain with and withdrawing recognition from Local 312; by bargaining directly with employees represented by Local 312; and by threatening those employees that they would permanently lose their jobs if they went on strike. 29 U.S.C. § 158(a)(1) & (5).

## II

Hajoca asserts that the Board order should be set aside. It first contends that replacement workers in a bargaining unit should be presumed to oppose union representation, and that on this view the company had a good faith doubt concerning Local 312's majority status during the strike that justified polling the employees. Hajoca also argues that the poll results lawfully enabled it to withdraw recognition. Regarding the allegations of direct dealing and threats, Hajoca urges that the record does not show that the company did anything other than present the employees with its bargaining position or inform them of the company's right to hire replacement workers.

### A. *Polling*

Absent extraordinary circumstances, a union's majority status is irrebuttably presumed for a one-year period following certification or voluntary recognition and continues during the term of any collective bargaining agreement with a term of three years or less. *NLRB v. Iron Workers Local 103*, 434 U.S. 335, 343 n. 8, 98 S.Ct. 651, 656, 54 L.Ed.2d 586 (1979); *Brooks v. NLRB*, 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954). The presumption of majority status survives the expiration of a collective bargaining agreement, but also becomes rebuttable. *NLRB v. Frick Co.*, 423 F.2d 1327, 1330 (3d Cir.1970).

An employer may conduct a poll of its employees to determine whether a union's majority status still exists, but only if the company possesses substantial, objective evidence to establish that it reasonably doubted the union's majority status before conducting the poll. *Howard M. Howes, Inc.*, 290 NLRB No. 166, 88–89 CCH, Para. 15,067 (1988); *Boaz Carpet Yarns, Inc.*, 280 NLRB No. 4, 122 LRRM 1139, 1144 (1986). This constraint aims to prevent several problems associated with employer polls, including: its tendency "to cause fear of reprisal in the mind of the employee," *Strucksnes Construction Co.*, 165 NLRB 1062, 65 LRRM 1385 (1967); its "potential for disrupting the bargaining process"; *Thomas Industries v. NLRB*, 687 F.2d 863, 869 (5th Cir.1981); and the possibility that it might "subvert the Board's electoral processes," *NLRB v. A.W. Thompson*, 651 F.2d 1141, 1144 (5th Cir.1981). Where an employer seeks to establish a good faith doubt of majority status, it must furnish

"clear, cogent and convincing evidence" to support its claim. *United Supermarkets, Inc. v. NLRB*, 862 F.2d 549, 552 (5th Cir. 1989). The evidence, moreover, must be "empirical and objective." *District 1199P, Hospital Employees v. NLRB*, 130 LRRM at 2205–06.

Hajoca asserts three bases for its good faith doubt of Local 312's majority status prior to the poll: (1) that the bargaining unit completely consisted of replacement workers; (2) that the replacements crossed the picket line of another union, Local 690; and (3) that one of the replacements criticized Local 690's pickets.

■ The Board and Courts of Appeals have adopted three general approaches to the presence of replacement workers in good faith doubt situations. We consider these approaches mindful that our scope of review requires us to follow the standards the Board enunciates, even when it alters those standards, so long as they are rational and consistent with the Act. *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979); *Restaurant Employees Union v. NLRB*, 760 F.2d 1006, 1008–09 (9th Cir.1985).

■ Originally, the Board mandated a rebuttable presumption that permanent striker replacements support the union no less than the economic strikers they replace. *See Windham Community Memorial Hospital*, 230 NLRB 1070 (1970), *enforced on other grounds*, 577 F.2d 805 (2d Cir.1978); *Pennco, Inc.*, 250 NLRB 716, 717 (1980), *enforced on other grounds*, 684 F.2d 340, 342–43 (6th Cir.), *cert. denied*, 459 U.S. 994, 103 S.Ct. 355, 74 L.Ed.2d 392 (1982). This presumption was rational and consistent with the Act. Insofar as a legal presumption may "function to further social, economic, or other policies, distinct from the fact presumed," the rebuttable presumption of replacement worker union support legitimately promoted the Act's purpose of maintaining a bargaining unit's certification in the face of potential unfair labor practices, including premature polling. *See NLRB v. Tahoe Nugget, Inc.*, 584 F.2d 293, 303–04 (9th Cir.1978). Notwithstanding, several Circuits criticized the un-

ion support presumption on empirical grounds. *See NLRB v. Pennco, Inc.*, 684 F.2d 340, 342–43 (6th Cir.), *cert. denied*, 459 U.S. 994, 103 S.Ct. 355, 74 L.Ed.2d 392 (1982); *NLRB v. Randle–Eastern Ambulance Service, Inc.*, 584 F.2d 720, 728–29 (5th Cir.1978); *NLRB v. Windham Community Memorial Hospital*, 577 F.2d 805, 812–13 (2d Cir.1978).

The Fifth Circuit not only rejected the Board's original presumption but inverted it. Reviewing a situation in which the striking union pledged to have replacement workers discharged, the Court held the union support presumption *per se* unreasonable. The Court suggested as a better presumption that replacement workers did not support the incumbent union. *Randle–Eastern Ambulance*, 584 F.2d at 728–29. A divided panel subsequently adopted the union opposition presumption in *Curtin Matheson Scientific, Inc. v. NLRB*, 859 F.2d 362 (5th Cir.1988). Other Courts of Appeals have criticized this standard as well. Presuming union opposition directly conflicts with the employer's burden of showing its good faith doubt by objective evidence. *Windham Community Memorial Hospital*, 577 F.2d at 812–13. Workers may cross picket lines as replacements, moreover, not out of opposition to unions but due to economic necessities. *Pennco*, 684 F.2d at 342–45. Finally, the presumption simply lacks empirical support. *See Buckley Broadcasting of California Corp. (Station KKHI)* 284 NLRB No. 113, 125 LRRM 1281 (1987). *See also, Pennco, Inc. v. NLRB*, 459 U.S. 994, 994–95, 103 S.Ct. 355, 74 L.Ed.2d 392 (White, J. dissenting) (opposing a denial of *certiorari* and noting that the union opposition presumption had limited support). Regardless of these criticisms, it is this standard which Hajoca urges this Court to follow.

In *Station KKHI*, the Board adopted the third course of making no presumptions. *Station KKHI* removed the employer's initial hurdle of having to come forward with evidence sufficient to show that replacement workers did not support the union, and then further evidence to carry its burden to show an objective basis for a good

faith doubt. Likewise, the Board also declined to adopt the inverse presumption, citing the criticisms set forth. The current standard instead consists of an all-the-circumstances test requiring the employer to come forward with "some further evidence" that replacement workers do not support the union. *Station KKHI,* 125 LRRM at 1286 (quoting *Pennco,* 684 F.2d at 343). *See Windham Community Memorial Hospital,* 577 F.2d at 812–13.

The Company argues that it had a good faith doubt of the Union's continued majority status sufficient to justify its polling and withdrawal of recognition based on (1) its presumption that striker replacements who cross another union's picket line thereby repudiate their own collective bargaining representative and (2) the disparaging remarks that one of the replacement drivers made about the union that was engaged in picketing. We first take up the presumption arising from striker replacements crossing the picket line.

The Board's application of its current approach to the facts in this case clearly cannot be deemed irrational or inconsistent with the Act. Nor can we reject it because we "might prefer another view." *Ford Motor Co.,* 441 U.S. at 497, 99 S.Ct. at 1849 (1979). This Court is therefore bound to follow the no presumption standard when, as here, striker replacements crossed the picket line of another union. As the Board stated in *Station KKHI,* the "mere fact that [replacements] crossed a picket line ... has no significance per se" since replacement workers commonly do so. 125 LRRM at 1286 (1987). *See Garret R.R. Car & Equipment,* 683 F.2d at 731; *Frick,* 423 F.2d at 1333–34. As applied to the facts before us, therefore, the no presumption standard makes eminent good sense.

Moreover, the all-the-circumstances test fully accords with our previous decisions (as does the union support presumption) whereas the presumption of non-support does not. This Court recently rejected the proposition that the presence of replacement workers may serve "as a basis for proof of loss of majority status." *NLRB v. Wallkill Valley General Hospital,* 866 F.2d 632, 637 (3d Cir.1989), *see Frick,* 423 F.2d at 1333–34. This view, further, accords with our previous ruling that a majority of replacement workers and nonstrikers in a given bargaining unit did not demonstrate the absence of a union majority. *Garret R.R. Car & Equipment,* 683 F.2d at 737.

The company's last item of evidence, statements made by Moss concerning the strikers, fails to sustain Hajoca's burden even given the exclusive presence of replacement employees who crossed the Local 690 picket. Moss told a warehouse employee that the strikers were "crazy" and "jerks" and that the strike did not get the picketers anywhere. The Board first found these comments to have been directed at Local 690, and even if directed at Local 312, which never picketed, they may have constituted no more than a no confidence vote in the strike rather than the union. *See Frick,* 423 F.2d at 1333; *Windham Memorial Hospital,* 577 F.2d at 814. Moss further commented that he "didn't want to have anything to do with the Union because it "didn't help them guys, they were out of a job." The Board determined that these statements plausibly reflected no more than Moss's economic need to work as a replacement employee even though he might be pro-union, especially given other remarks Moss made that were either pro-union or neutral. *See Pennco,* 684 F.2d at 342–43. Isolated and ambiguous statements by a single worker, even assuming he made up half the bargaining unit, do not suffice to sustain the company's burden. In sum, the Board properly determined that Hajoca did not establish a good faith doubt of Local 312's majority prior to its poll.

### B. *Withdrawal of Recognition*

Before an employer can withdraw recognition, it must rebut the presumption of a union's continued majority status either by showing that the union had in fact lost majority support, or, as with polling, by presenting objective evidence sufficient to sustain a reasonable good faith doubt that the majority of the bargaining unit still supports the union. *Wallkill Valley,*

866 F.2d at 636; *Iron Workers Local 3 v. NLRB*, 843 F.2d 770, 772 (3d Cir.1988); *Frick*, 423 F.2d 1327. The employer bears the "difficult" at burden of proof to make either showing.[1] *District 1199P*, 130 LRRM at 2205.

 Given the Board's determination that Hajoca had failed to demonstrate a good faith basis for polling, its conclusion that Hajoca had also failed to meet its burden regarding withdrawal necessarily follows. Hajoca cannot rely on the three items of objective evidence it put forward to justify polling for the reasons set forth. Nor, since it had no justifiable basis to take the survey, can it rely on the results of the poll. An employer may not withdraw recognition or avoid the duty to bargain by demonstrating a loss of majority status arising from its own unfair labor practices.[2] *Wallkill Valley General Hospital*, 866 F.2d at 636; *Frick*, 423 F.2d at 1333.

### C. *Direct Bargaining*

 The Board also found that Hajoca had earlier bypassed Local 312 and negotiated with the bargaining unit employees. An employer who attempts an end run around a certified union's bargaining representatives and negotiates directly with employees violates section 8(a)(5) and (1) of the Act. 29 U.S.C. § 158(a)(5) and (1); *NLRB v. Allis–Chalmers Mfg. Co.*, 388 U.S. 175, 180, 87 S.Ct. 2001, 2006, 18 L.Ed.2d 1123 (1967); *Johnson v. Food & Commercial Workers Local 23*, 828 F.2d 961, 967 (3d Cir.1987). To allow direct bargaining would eviscerate the mandate of section 9(a) of the Act that representatives

duly elected by majority vote be the exclusive bargaining agents of all the employees in a bargaining unit. 29 U.S.C. § 159(a); *Johnson*, 828 F.2d at 967. Collective bargaining, moreover, does not merely consist of asking employees to give a yes or no on a proposal. It also consists of presenting an entirely new proposal that potentially undermines the authority of the duly elected bargaining representatives. 29 U.S.C. § 158(c) and (d), *see NLRB v. Wings & Wheels, Inc.*, 324 F.2d 495, 496 (3d Cir. 1963).

 The Board found that Hajoca bargained directly when Ezzo met with warehousemen and drivers on July 2 and presented its new first-year wage-freeze proposal without first having gone to Local 312. It based this finding on the testimony of Little and Borreggine, the two drivers, as well as two warehousemen. The record further shows that Local 312 prepared a direct bargaining charge on July 8 and that Hajoca did not present the first-year wage-freeze plan until July 9. The company relied solely on the testimony of Ezzo, who claimed that he simply outlined Hajoca's May 28 bargaining position in the context of the company's financial situation.

The Board properly credited the employees' testimony over that of Ezzo to find direct bargaining. When supported by substantial evidence on the record as a whole, the Board's findings of fact are dispositive. 29 U.S.C. § 160(e) (section 10(e) of the Act); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 490, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); *Hedstrom*

---

1. This case does not require a decision as to whether the evidence required to justify a poll must also be sufficient to justify the withdrawal of recognition. The Board has answered this question affirmatively, taking the position that the quantum of "substantial, objective evidence" necessary to justify a poll must equal the quantum of evidence necessary to support withdrawal. *Thomas Industries*, 225 NLRB 646, 647 (1981), *enf't denied*, 687 F.2d 863 (6th Cir.1982). Several Circuits have criticized this standard and held that a lessor quantum of evidence suffices for polling. *NLRB V. A.W. Thompson, Inc.*, 651 F.2d 1141, 1145 (5th Cir.1981); *Thomas Industries v. NLRB*, 687 F.2d 863, 866 (6th Cir.1982); *Mingtree Restaurant v. NLRB*, 736 F.2d 1295, 1299 (9th Cir.1984). The Board has

yet to modify its standard in light of this criticism. *Boaz Carpet Yarns*, 280 NLRB No. 4, 122 LRRM 1139 (1986). Here the evidence on which Hajoca relied on did not even meet the standard requiring the lesser quantum, and we enforce the order on this basis.

2. Hajoca does not expressly petition from the Board's determination that the company, in withdrawing recognition, also refused to bargain with Local 312. Hajoca can no more rely on the evidence it has advanced to justify its refusal to bargain than it could for withdrawing recognition. *See Wallkill Valley General Hospital*, 866 F.2d at 636.

*Co. v. NLRB*, 629 F.2d 305, 313 (3d Cir. 1980) (*en banc*), *cert. denied*, 450 U.S. 996, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981). The Board's credibility determinations in particular merit great deference. *ABC Trans–National Transport v. NLRB*, 642 F.2d 675, 686 (3d Cir.1981); *Frick*, 423 F.2d at 1333 n. 11. The record shows that four workers gave mutually consistent testimony as to the new proposal, which was further consistent with Local 312's preparation of a direct bargaining claim the day before the next formal bargaining session. In the face of Ezzo's lone opposing account, the Board reasonably credited the employees, whose testimony in turn furnished sufficient evidence to establish a violation. *See Krispy Kreme Doughnut Corp. v. NLRB*, 732 F.2d 1288, 1293 (6th Cir.1984).

Hajoca urges a reversal of the Board's credibility determination on an array of grounds, including: that Local 312 failed to make a strenuous objection to the direct bargaining in the formal July 9 meeting; that Ezzo's version better comported with the company's financial situation; that the administrative law judge's characterization of the May 28 meeting as informal evinced bias; and that Ezzo would not later in the day have admitted to direct bargaining to Borreggine, a shop steward. These objections are without merit. Moreover, a reviewing court may not overturn an inference drawn by the Board even if it would have decided the other way. *D & D Distribution Co. v. NLRB*, 801 F.2d 636, 641 (3d Cir.1986).

### D. *Threats*

 Finally, the Board found that Ezzo, in his later July 2 meeting with Borreggine and a warehouse employee, threatened the workers with permanent replacement in violation of Section 8(a)(1) of the Act. 29 U.S.C. § 158(a)(1). Striking workers retain their status as employees and must be fully reinstated when a strike ends. 29 U.S.C. § 152(3) (section 2(3) of the Act); *NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378, 88 S.Ct. 543, 545, 19 L.Ed.2d 614 (1968). The right to full reinstatement applies even when an employer

has hired permanent replacements. *Laidlaw Cor. v. NLRB*, 414 F.2d 99, 105 (7th Cir.1969), *cert. denied*, 397 U.S. 920, 90 S.Ct. 928 (1970). Telling striking employees that they will be fired is a threat to interfere with their section 7 rights and constitutes an unfair labor practice. *NLRB v. Proler International Corp.*, 635 F.2d 351, 355 (5th Cir.1981); *Emerson Electric Corp.*, 287 NLRB No. 102, slip. op. at 4–6, 127 LRRM 1147, 1148 (1988).

 The Board's finding again rests on a reasonable inference made from sufficient evidence. According to Borreggine's undisputed testimony, corroborated by one of the warehousemen, Ezzo stated that if the employees refused to accept the wage-freeze offer, they "would no longer have a job" and "would all be replaced with non-union employees." Ezzo added that Hajoca had job applications ready and people waiting to "take" the workers' jobs. The company contends that Ezzo merely asserted an employer's section 8(c) right to explain the parties' legal position under the Act. 29 U.S.C. § 158(c). In effect, Hajoca desires an inference that Ezzo meant the employees would merely lose their jobs temporarily for the duration of the strike. Ezzo's unqualified language more reasonably bears the contrary inference that he ill-advisedly went beyond a lawful explanation of *Fleetwood* or *Laidlaw*, especially given that he had already engaged in one unfair labor practice already by directly bargaining. *See Alpha Cellulose Corp.*, 265 NLRB 177 (1982), *enforced mem.*, 718 F.2d 1088 (4th Cir.1983) (employer letter stating that employees would "lose their jobs" was threat).

### III

The Board's order is supported by substantial evidence and there are no grounds for denying its enforcement. The order will therefore be enforced in full, and the petition for review will be denied.