MURNAGHAN, Circuit Judge,
concurring in part and dissenting in part:
Although I concur in sections 111(A), 111(B)(2), and 111(C)(2) of the majority’s opinion, I find that there is substantial evidence to support the findings of the Administrative Law Judge (ALJ) and the National Labor Relations Board (NLRB or Board) that Amerieare Pine Lodge Nursing and Rehabilitation Center (Amerieare) directly dealt with its employees. I therefore respectfully dissent from the remainder of the majority’s opinion.
I. Direct Dealing
Since most of the Board’s findings at issue are either pure questions of fact or mixed questions of law and fact, we must respect the Board’s findings as conclusive if supported by substantial evidence based upon the record' as a whole. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 491, 71 S.Ct. 456, 95 L.Ed. 456 (1951); 29 U.S.C.A. § 160(e) (West 1998); Pirelli Cable Corp. v. N.L.R.B., 141 F.3d 503, 514 (4th Cir.1998). Substantial evidence “ ‘must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury.’ ” Universal Camera Corp., 340 U.S. at 477, 71 S.Ct. 456 (quoting N.L.R.B. v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660 (1939)). A court should direct a verdict only if the evidence is such that “a reasonable [person] could come to but one conclusion.” Westfarm Assocs. Ltd. Partnership v. Washington Suburban Sanitary Commission, 66 *884 F.3d 669, 683 (4th Cir.1995); 9A Charles A. Wright, et al., Federal Practice & Procedure: Civil § 2524, at 262 (2d. ed.1995).
I disagree with the Court’s ready dismissal of the Board’s interpretation of many of the mixed questions of fact and law. I certainly do not find that the majority’s counter-interpretations are the only conclusions a reasonable person could draw from the evidence.
The majority erred on several accounts. First, the majority erred at times by substituting its own reasonable interpretation of the facts for the Board’s. In particular, in section 111(B)(1) the majority erred by disregarding the Board’s reasonable interpretation of the July 12 meeting. The majority asserts that it is not disputed that an employee, not management, raised the question about the status of anniversary wage increases at the July 12 meeting.[1] The Board, however, adopted the ALJ’s finding that supervisor Thomas first asked the employees how they viewed the July 5 proposal. This was based on the direct examination of employee Burgess, during which she testified that the subject of the July 5 proposal first came up at the July 12 meeting when Thomas “asked us.” While the record evidence on the sequence of events is not crystal clear, this testimony provides substantial evidence to support the Board’s conclusion that Thomas solicited employee questions about, and was the first to raise, the July 5 proposal at the July 12 meeting.
In fact, one could question the reasonableness of the majority’s take on the facts. The majority asserts that employee Elliott first asked supervisor Thomas whether anniversary wage increases were included in the July 5 proposal while the two were alone. In response, Thomas called a meeting of several employees so that Elliott could repeat her question. Thomas did not know the answer to the question so she called her supervisor, Jackie Clark, to the meeting to see if Clark could answer it. Here is the problem with the majority’s approach: What possibly could have motivated Thomas to call the other employees into a meeting so that Elliott could repeat a question, when Thomas, by her own admission, did not know the answer to Elliott’s question in the first place? It is certainly a permissible inference (perhaps it is the only reasonable inference) that Thomas was trying to elicit feedback about the July 5 proposal from the other employees— to see if they shared Elliott’s concerns or had other suggestions about the proposal.[2]
Second, the majority obfuscated the correct legal standard. The issue in this case is whether Americare engaged in direct dealing in violation of §§ 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C.A. § 158(a)(1) & (a)(5) (West 1998). The majority focused heavily on section 8(c) of the NLRA, which immunizes the expression of any views, arguments or opinions if such expression “contains no threat of reprisal or force or promise of benefit.” 29 U.S.C.A. § 158(c) (West 1998). In a vigilant effort to secure § 8(c)’s protections, the majority evaluated each communication at issue, in particular the written communications on July 28 (section III(C) of the opinion) and the personal contacts from July 31 through August 4 (section III(D) of the opinion), to see whether or not Americare had made threats or quid pro quo promises in these communications. Finding none, the majority held that no direct dealing took place.
Direct dealing may exist, however, even if no threat or promise is made by the employer. Direct dealing occurs, inter alia, when *885 an employer attempts to bypass the Union in negotiations over the terms and conditions of employment. See Medo Photo Supply Corp. v. N.L.R.B., 321 U.S. 678, 683-684, 64 S.Ct. 830, 88 L.Ed. 1007 (1944); N.L.R.B. v. Pratt & Whitney Air Craft Div., 789 F.2d 121, 134 (2nd Cir.1986). The question turns on whether the employer’s actions — direct solicitation of employee sentiment, perceived give- and-take over working conditions, or disparagement of the union — are likely to erode or undermine the union’s position as exclusive bargaining agent of the employees. See Alexander Linn Hosp. Ass’n, 288 NLRB 103, 106 (1988), enforced sub nom., N.L.R.B. v. Wallkill Valley General Hosp., 866 F.2d 632 (3rd Cir.1989). In short, a court should examine “whether the employer has chosen ‘to deal with the Union through the employees, rather than with the employees through the Union.’ ” Pratt & Whitney Air Craft Div., 789 F.2d at 134 (quoting N.L.R.B. v. General Elec. Co., 418 F.2d 736, 759 (2nd Cir.1969)). Accord Facet Enters., Inc. v. N.L.R.B., 907 F.2d 963, 968 (10th Cir.1990).
There are a series of cases (which I will call the “Survey cases”) which illustrate the point very clearly, and which are relevant to the case sub judice. The Survey cases establish that an employer’s effort to poll or survey employees about their opinions on issues subject to bargaining with the union constitutes unlawful direct dealing. Such direct solicitation of employee sentiment “plainly erodes the position of the designated representative.” Allied-Signal, Inc.,. 307 N.L.R.B. 752, 754, 1992 WL 122628 (1992). It is the union’s exclusive province to gather employee views, and the strength of those views, on matters subject to collective bargaining. See id.; Obie Pacific, Inc. v. Seattle Local 4.9, 196 N.L.R.B. 458, 1972 WL 4365 (1972); Wallkill Valley General Hosp., 866 F.2d at 636; Harris-Teeter Super Markets, Inc. v. United Food and Commercial Workers Union, Local 204, 293 N.L.R.B. 743, 744-45, 1989 WL 223931 (1989), enforced, 905 F.2d 1530, 1990 WL 74312 (4th Cir.1990) (unpublished opinion). But see Vons Grocery Co., 320 N.L.R.B. 53, 1995 WL 789954 (1995) (permissible to ask employees how they will vote in upcoming post-bargaining election).[3]
The majority’s heavy reliance on cases, such as Dow Chemical Co. v. N.L.R.B., 660 F.2d 637 (5th Cir.1981), N.L.R.B. v. Garry Manufacturing Co., 630 F.2d 934 (3rd Cir.1980), and Crown Cork & Seal Co. v. N.L.R.B., 36 F.3d 1130 (D.C.Cir.1994), involving union certification and decertification elections clouds the direct dealing standard. Cases involving union certification and decer-tification elections are generally not helpful in the direct dealing context because in such cases, by definition, direct dealing is not an issue. In the context of a union certification election, the employees have not yet designated the union to be their exclusive bargaining agent, so the employer is not obligated by statute to negotiate exclusively with the union. Similarly, the entire purpose of a union decertification election is to circumvent the union, so direct dealing concerns are at a minimum. These cases, therefore, give a wide berth to employer communications and focus almost exclusively on whether the employer has used coercion or threats. See, e.g., N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 617, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); Louisburg Sportswear Co. v. N.L.R.B., 462 F.2d 380, 385 (4th Cir.1972). In contrast, communications that do not contain threats or promises may constitute direct dealing because, as in the Survey cases discussed above, in the direct dealing context the employer’s “communications are more than evidence of an unfair labor practice; they are the unfair labor practice itself.” Safeway Trails, Inc. v. N.L.R.B., 641 F.2d
*886 930, 933 (D.C.Cir.1979) (finding employer had committed unfair labor practice by attempting to undermine and subvert the authority of the employees’ chief bargaining representative). The fact that the majority did not find direct dealing is therefore not surprising, since it was often looking for the wrong behavior.
The majority’s most severe error is that it examined each incident in isolation, using its sterile scalpel to sever each communication from the others and render its diagnosis: communication six was malignant, but communications one through five, seven, and eight, were benign. In fact, however, we are not concerned with a series of isolated lumps, but a single tumor — -an interrelated course of conduct carried out by Americare over a short period of time. And it was reasonable for the Board to conclude that the conduct was infected throughout. See Pratt & Whitney Air Craft Div., 789 F.2d at 135 (even if the communications do not individually constitute unlawful direct dealing, “the challenged communications can be viewed within a pattern of other unfair labor practices which, when examined in its totality, reveal direct dealing....”).
The majority neglected to examine the record in its totality. For instance, in section 111(B)(1), the majority stated about the July 12 meeting called by Dreama Thomas, “[tjhere was no indication ... that Pine Lodge was attempting to formulate a new proposal, and there is no evidence that a management employee implied that any concerns raised would be addressed by Pine Lodge.” Ante, at 878. When viewed in isolation, the majority might be correct; but the record supports the contrary conclusion when the entire course of Americare’s conduct is examined. The majority found that Sherry Johnson’s July 28 memorandum constituted unlawful direct dealing because it implied that quid pro quo dealing was possible. One of the sections of that same memorandum stated, “please note for the employees who were concerned about not getting an anniversary wage increase, this is being offered also.” Here was a clear signal to employees that any concerns raised would be addressed by Americare when formulating a new proposal. It is noteworthy that the concerns mentioned in the memorandum are exactly those concerns solicited from employees at the July 12 meeting.[4]
Similarly, when one connects the dots between the July 28 offer letter, the various solicitations of employee sentiment between July 31 and August 4, and Americare’s flyers and memoranda, a picture emerges which substantially supports the Board’s direct dealing diagnosis. Americare’s first offer to the Union was rejected. While the offer was outstanding, management personnel solicited employee concerns about the offer. Ameri-care shortly thereafter issued another offer. The letter announcing that offer began, “Enclosed please find an ... offer extended to the ... employees at Americare-Pine Lodge.” The implication of this statement was emphasized by the fact that the offer was disseminated to each employee at the same time as it was sent to the Union.[5] The letter dared the Union to let the employees decide on their own whether or not to accept the offer, instead of having the Union, as their representative, make the decision. The July 28 offer was accompanied by a memorandum stating that the offer was extended because employees had come to management “after the Union did not respond to the previous offer.” Further, the July 28 offer *887 “also” included a provision on anniversary increases; the employees were told that this provision had been included “for the employees who were concerned about” the issue. Employees might remember that Americare knew of their concerns because it had solicited their opinions. After the offer was extended, management personnel continued to solicit employee input about the offer. Could this have been for the purpose of gauging the need to improve its offer yet again? Finally, various memoranda and fliers told the employees that “the Union wants to take you out on a statewide strike” and that they should “STAND UP to the Union” since Americare “DO[ES] NOT INTEND” to offer a similar wage increase if they have to bargain with the Union.[6] When the record is thus viewed in its totality, there is substantial evidence to support the Board’s conclusion that Americare engaged in a course of conduct involving a give-and-take with employees, which was meant to circumvent the Union and otherwise undermine the Union’s role as exclusive bargaining agent for the employees.
If the ease had been before me as a matter of first impression I may not have come to the conclusions made by the ALJ and adopted by the Board. But our review is merely under a substantial evidence standard. This court should not “displace the Board’s choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.” Universal Camera Corp., 340 U.S. at 488, 71 S.Ct- 456. I cannot agree that the Board was unreasonable in finding that Americare sought to deal with the Union through the employees rather than the employees through the Union. Pratt & Whitney Air Craft Div., 789 F.2d at 134. And that is all we are permitted to examine.
II. Taint
Having found substantial evidence to support the Board’s conclusions that Americare was engaged in a course of direct dealing, I would affirm the Board’s determination that this course of direct dealing tainted the union decertification petition that soon followed under the test set forth in N.L.R.B. v. Williams Enterprises, Inc., 50 F.3d 1280, 1288 (4th Cir.1995).
I would, therefore, affirm the Board’s overall decision, and enforce the Board’s order.

. The majority glossed over an important fact. As the Board pointed out, even if Elliott asked Thomas about the July 5 proposal prior to the July 12 meeting, the evidence is undisputed that Thomas unilaterally called the other employees together to discuss the proposal. Elliott had not requested such a meeting.

. The majority argues that, if it was Americare’s goal to elicit feedback, they "roundly failed," ante at 878 n. 5, because they neither asked about the proposal nor learned anything more about employee views. First, the majority incorrectly clings to its interpretation of the facts. As noted above, substantial evidence supports the AU's determination that Americare did ask the employees what they thought of the proposal at the July 12 meeting. Second, I hope that the majority does not mean to advocate a rule that direct dealing may only be found when an employer is successful or particularly adept in its efforts directly to deal with employees. The NLRA outlaws direct dealing whether it is undertaken by a bumbling or a skillful employer.

. Citing to Vons, the majority argues that direct dealing concerns were at a minimum because once a vote has been scheduled, no further bargaining is possible. Regardless of the validity of Vons, the majority's argument is not persuasive given the facts of the case sub judice. The ALJ and the Board specifically found that Americare had modified its July 5 proposal based on its solicitation of employee opinion. In this context, it was not unreasonable for the ALJ and the Board to conclude that Americare’s continued solicitation of employee input was for the purpose of gauging employee opinions about, and incorporating such opinions into, its proposal. The vote at issue was not the end-game: Since Americare's proposals came outside the normal bargaining time-period, any "intelligence” on employee sentiment gained could be used to formulate later negotiating strategies, undermining the Union’s role as bargaining agent.

. The majority rejected the ALJ's finding that the inclusion of anniversary increases in the July 28 offer letter provided evidence of give-and-take. The majority believes that the July 28 offer letter merely clarified the previous July 5 proposal. Yet Sherry Johnson, who put both wage proposals together, testified that she had not given any thought to how anniversary increases would be handled in the July 5 proposal and that she could not tell employees that the July 5 proposal included anniversary increases. Nor do the terms of the collective bargaining contract provide support for the majority's view. The contract did not set marginal increases in salary each year regardless of current pay; instead it associated a nominal salary with a given tenure. Under this system a "Level Two” employee with 5 years at Americare could conceivably have missed two years worth of anniversary wage increases under the July 5 proposal.

. While the simultaneous dissemination, in isolation, does not constitute direct dealing, see ante section 111(A), we may still consider it in the context of a pattern of direct dealing.

. The majority concludes that Americare’s assertion that the Union intended to strike and that Americare did not intend to offer a similar wage increase in the future are protected by § 8(c). I disagree. Employer predictions must be "carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control....” Gissel Packing, 395 U.S. at 618, 89 S.Ct. 1918. There was no objective basis for the belief that the Union would force the employees to strike in December. First, as the record shows, a strike would require an employee vote. Second, to paraphrase the Supreme Court in Gissel Packing, Americare had no support for its basic assumption that the Union, which had not yet presented any demands, would have to strike to be heard. Gissel Packing, 395 U.S. at 619, 89 S.Ct. 1918.
Separately, whether Americare decided to offer similar wage increases in Union negotiations in December is totally within Americare's control. A legitimate reading of the statement "we DO NOT INTEND to offer such a generous wage increase if we have to bargain in December” is that if employees do not accept the unilateral offer from Americare, Americare will not bargain in good faith during the scheduled negotiations with the Union.